1 A.3d 747 (2010)
415 N.J. Super. 179
In the Matter of the XANADU PROJECT AT the MEADOWLANDS COMPLEX; Application of Benihana Meadowlands Corporation for a Special Concessionaire Permit.
Docket No. A-2702-08T2
Superior Court of New Jersey, Appellate Division.
Argued March 16, 2010.
Decided August 6, 2010.
*749 Paul F. Carvelli, Florham Park, argued the cause for appellants New Jersey Restaurant Association, Park & Orchard Restaurant, Taos Restaurant, Candlewyck Diner, Tredici Restaurant, and the Landmark (McCusker, Anselmi, Rosen & Carvelli, attorneys; Mr. Carvelli and Patrice LeTourneau, on the brief).
Lisa Hibner Tavani, Deputy Attorney General, argued the cause for respondent Division of Alcoholic Beverage Control (Paula T. Dow, Attorney General, attorney; Lorinda Lasus, Deputy Attorney General, of counsel; Ms. Tavani, on the brief).
William Harla argued the cause for respondents Benihana Meadowlands Corporation, ERC 16W Limited Partnership and Meadowlands Management, L.L.C. (DeCotiis, Fitzpatrick, Cole & Wisler, attorneys; Mr. Harla and Michael R. Cole, of counsel; Thomas A. Abbate, Teaneck, on the brief).
Gordon J. Golum, Woodbridge, argued the cause for respondent New Jersey Sports & Exposition Authority (Wilentz, Goldman & Spitzer, attorneys; Mr. Golum, of counsel; Mr. Golum and Jeffrey J. Brookner, on the brief).
Before Judges CARCHMAN, LIHOTZ and ASHRAFI.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
While one usually obtains authorization to sell alcoholic beverages by way of a municipality-issued license, N.J.S.A. 33:1-12.14, when the sales will take place on State property, authorization to sell is obtained by way of a special concessionaire permit issued by the Director of the New Jersey Division of Alcoholic Beverage Control (ABC). N.J.S.A. 33:1-42. The requirements for obtaining a special concessionaire permit are (1) the State or its political subdivision has entered into a contract with the applicant authorizing the sale of alcoholic beverages on the property; (2) the property on which the sale will take place is State property; and (3) the applicant has convinced the Director that it is fit to serve alcoholic beverages. N.J.A.C. 13:2-5.2.
In this appeal, the New Jersey Restaurant Association (NJRA), Park and Orchard Restaurant, Taos Restaurant, Candlewyck Diner, Tredici Restaurant and The Landmark (collectively appellants), all of whom hold municipally-issued plenary liquor licenses, challenge the decision of the Director and the ABC granting an application submitted by Benihana Meadowlands Corp. (Benihana) for a special concessionaire permit, which authorized Benihana to sell alcoholic beverages for on-site consumption within its restaurant. The property on which Benihana proposed to operate its restaurant will be located within Xanadu, the entertainment complex within the Meadowlands Sports Complex, which is owned by the New Jersey Sports and Exposition Authority (NJSEA), a political subdivision of the State of New Jersey. NJSEA had leased the Xanadu real estate to Mills/Mack-Cali (the developer), who then subleased a portion of the building to Benihana.
We conclude that the requirements of N.J.A.C. 13:2-5.2 were met, and we affirm *750 the final decision of the Director and the ABC.
These are the facts adduced from the record. On September 7, 2007, Benihana submitted to Jerry Fischer, Director of ABC, its application for a special concessionaire permit followed by the requisite service on appellants together with published notice in The Bergen Record.
Appellants filed timely notice with Fischer objecting to Benihana's application for the following reasons: 1) Benihana did not satisfy the criteria for receiving a special concessionaire permit because (a) it had not entered a bona fide contract with NJSEA, authorizing the sale of alcoholic beverages; (b) the building in which Benihana would operate was not a public building because it was owned by the developer; and (c) the seventy-five year lease between the developer and NJSEA effectively transferred ownership of the property to the developer; 2) N.J.A.C. 13:2-5.2 was inconsistent with the policy and terms of the ABC Act, and the regulation is invalid; 3) issuing Benihana a special concessionaire permit would (a) "violate New Jersey law concerning municipal control over the retailing of alcoholic beverages", (b) amount to the issuance of a plenary license, which only municipalities may issue, and (c) improperly increase the amount of plenary licenses within the municipality; and 4) issuing Benihana a special concessionaire permit would violate appellants' due process, equal protection and property rights.
Appellants requested that Fischer refer the matter to the Office of Administrative Law (OAL) for a plenary hearing before an administrative law judge (ALJ), claiming that the matter amounted to a "contested case." The Administrative Procedure Act (APA) defines a "contested case" as "any licensing proceeding, in which the legal rights ... or other legal relations of specific parties are required by constitutional right or by statute to be determined... after opportunity for an agency hearing[.]" N.J.S.A. 52:14B-2(b). Additionally, appellants claimed that an ALJ should hear the case because it involved constitutional issues outside of Fischer's area of expertise.
After Fischer conducted a conference with the interested parties, appellants asked that he recuse himself, claiming that he was biased in favor of the developer. In so contending, they relied on a June 23, 2005 advisory opinion that Fischer had issued, which stated that because Xanadu was located on state property, Fischer would entertain applications for special concessionaire permits submitted by Xanadu tenants.
NJRA, one of the appellants in this case, as well as Hartz Restaurant Association (Hartz), had appealed that advisory decision. See In re Determination by Dir. of the Div. of Alcoholic Beverage Control, 392 N.J.Super. 577, 580, 921 A.2d 1159 (App. Div.2007) (hereinafter In re Xanadu Permits). We declined to entertain the appeal, concluding that generally "courts in New Jersey do `not render advisory opinions or function in the abstract.'" Id. at 581, 921 A.2d 1159 (quoting Crescent Pk. Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107, 275 A.2d 433 (1971)). However, we noted that we found "no fault with the Director's assertion of subject matter jurisdiction as a way of beginning the evaluative process, but the underlying issues may not proceed to final resolution on the administrative level before the objections raised by appellants receive an appropriate hearing." Id. at 583-84, 921 A.2d 1159.
Following the conference, appellants submitted to Fischer a statement of their objections and the facts implicated by the objections. They advanced the same objections as previously noted and repeated *751 their request for a transfer to the OAL. They also added a claim that Fischer's June 2005 advisory opinion was improperly issued because Fischer had failed to comply with N.J.A.C. 13:2-36.1(a), which provides that the ABC Director should issue an advisory opinion only when the matter relates to "issues not previously articulated by the Division or involves a substantial question of general applicability." They later again wrote to Fischer and requested that he recuse himself, arguing Fischer's "demonstrated commitment" to his prior findings and conclusions was "inappropriate as a matter of law and provide[d] an independent basis for" his recusal.
Fischer issued an order denying appellants' request for recusal. He explained that none of the reasons that appellants had advanced in support of their request had merit, and he had no pecuniary interest in Benihana's receipt of a special concessionaire permit. Further, Fischer said, the authority to decide contested cases was vested in the agency head, so even if he referred the matter to the OAL, an ALJ would merely issue a recommendation, which Fischer could reject.
He, thereafter, issued a scheduling order that requested additional briefing on whether N.J.A.C. 13:2-5.2 was a valid regulation and whether the Director of the ABC had the statutory authority to grant a special concessionaire permit. He also preliminarily decided that the matter was not a contested case; however, he gave appellants the opportunity to further brief whether Benihana's application implicated any of appellants' constitutionally protected rights and elevated the dispute to a contested case. Assuming that his preliminary decision was correct, Fischer said that he would not transfer the matter to the OAL, and that he would not allow discovery because the right to be heard in a non-contested case did not include such a right.
After receipt of the parties submissions, Fischer entered a final pre-hearing order. In that order, he determined that N.J.A.C. 13:2-5.2 was a valid regulation, and that he had the authority to issue a special concessionaire permit. He found that Hartz had failed to establish a constitutional right to a hearing and again rejected the request to transfer the matter to the OAL as a contested case.
Consistent with his findings in the advisory opinion, Fischer found that the property on which Benihana would operate was owned by a public entity, and that the seventy-five-year lease between NJSEA and the developer did not divest NJSEA of its ownership rights in the property. Further, he found that Benihana had entered into a valid contract with NJSEA, authorizing the sale of alcoholic beverages on the property, and Benihana had satisfied the contract and state-property criteria for receiving a special concessionaire permit.
He then scheduled a hearing at which time evidence could be presented on the last remaining issuewhether Benihana was qualified to receive a special concessionaire permit. Appellants did not appear at the hearing. The only objector who appeared was Hartz.
By order dated December 18, 2008, Fischer granted Benihana's application for a special concessionaire permit, finding that it had satisfied the criteria for receiving a permit, and that it was fit to sell alcoholic beverages. This appeal followed.
On appeal, appellants challenge the issuance of the permit and raise the following issues: (1) Fischer should have recused himself from deciding whether to grant Benihana's application for a special concessionaire permit because he was biased; (2) the hearing that Fischer provided appellants *752 was inadequate to protect appellants' property interests in their liquor licenses and did not comply with our decision in In Re Xanadu Permits, as he stated he would entertain applications for special concessionaire permits submitted by Xanadu tenants; (3) Benihana did not satisfy the criteria for receiving a special concessionaire permit; and (4) issuing Benihana a special concessionaire permit violated the policy of the Alcoholic Beverage Control Act, N.J.S.A. 33:1-1 to -97. We address the issues seriatim.

I.
Appellants contend that Fischer erred in denying their request for recusal, reasoning that Fischer was biased and unable to impartially decide the issues in this case.
In addressing this issue, we consider the powers and responsibilities of the Director. The Director of the ABC is charged with the duty "to supervise the manufacture, distribution and sale of alcoholic beverages in such a manner as to fulfill the public policy and legislative purpose of" the ABC Act. N.J.S.A. 33:1-3. One of the purposes is "[t]o strictly regulate alcoholic beverages to protect the health, safety and welfare of the people of this State." All other purposes stem from this fundament. See N.J.S.A. 33:1-3.1(b) (listing nine other purposes).
Among the powers that the Director may exercise in carrying out the Act's policy and purpose are the powers to adopt rules and regulations and to authorize the sale of alcoholic beverages on property owned or controlled by the State or its political subdivisions, subject to those rules and regulations. N.J.S.A. 33:1-39 and -42.
In furtherance of this authority, the Director adopted N.J.A.C. 13:2-5.2. This regulation establishes the criteria to obtain a special concessionaire permit. In relevant part, the regulation provides:
(a) Application for a special concessionaire permit may be made to the Director by any individual, partnership, corporation, limited liability company, or other type of legal entity who has entered into a contract with the State of New Jersey, or any political subdivision thereof, whereby said person or organization is authorized to sell alcoholic beverages for immediate consumption in any public building or on any property owned by or under the control of the State of New Jersey or any political subdivision thereof. Such permit may also authorize the sale of alcoholic beverages in original containers for off-premises consumption, provided the applicant, with the consent of the governmental agency, establishes to the satisfaction of the Director that there is good cause for such sales.
[Ibid.]
Within ten days of filing the application, the applicant must post public notice of its filing. N.J.A.C. 13:2-5.2(d). Any party objecting to the application is entitled to a hearing upon submission of a written objection to the Director:
Upon timely receipt of a duly signed written objection to the issuance of a special concessionaire permit, the Director will afford a hearing to all parties and notify the applicant and the objector of the date, hour and place thereof. No hearing need be held if no objection shall be lodged, but the application shall not be denied without first affording the applicant an opportunity to be heard.
[N.J.A.C. 13:2-5.2(f).]
If the objection raises issues sufficient to designate the matter as a "contested case," the Director may refer the matter to the OAL for a hearing before an ALJ. N.J.S.A. 52:14B-10; N.J.S.A. 52:14F-7 a. However, such referral is discretionary. *753 In re Application of County of Bergen, 268 N.J.Super. 403, 413, 633 A.2d 1017 (App. Div.1993) (explaining that the agency head has the discretion to refer a case to the OAL for a hearing). The APA defines "contested case" as
a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing, but shall not include any proceeding in the Division of Taxation, Department of the Treasury, which is reviewable de novo by the Tax Court.
[N.J.S.A. 52:14B-2(b).]
If the Director exercises his or her discretion and refers a contested case to the OAL, an ALJ holds a trial-like hearing on the matter. N.J.S.A. 52:14B-10. At the close of the hearing, the ALJ issues a recommendation to the agency head on findings of fact and conclusions or law. N.J.S.A. 52:14B-10(c) and (d). The ALJ's recommendation has no independent force and effect, as the agency Director "has the exclusive right to decide" the case. In re Kallen, 92 N.J. 14, 20, 455 A.2d 460 (1983). The statute provides:
[T]he agency head may reject or modify [the ALJ's] findings of fact, conclusions of law or interpretations of agency policy..., but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record.
[N.J.S.A. 52:14B-10(c).]
We may review the agency head's decision, and when doing so, we apply a deferential standard of review. In re Application of County of Bergen, supra, 268 N.J.Super. at 410, 633 A.2d 1017. If we are "satisfied after [our] review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then [we] must affirm even if [we] feel[ ] that [we] would have reached a different result itself." In re Tenure Hearing of Young, 202 N.J. 50, 70, 995 A.2d 826 (2010) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588, 538 A.2d 794 (1988)).
Appellants argue that Fischer should recuse himself from the case and allow an ALJ to decide the matter because Fischer demonstrated that he was unable to remain impartial in reviewing Benihana's application as evidenced by: (1) the absence in Fisher's advisory opinion of the criteria for issuing an advisory opinion contained in N.J.A.C. 13:2-36.1(a), which limits advisory opinions to "issues not previously articulated by the Division" and to "question[s] of general applicability"; (2) satisfaction of neither criterion in N.J.A.C. 13:2-36.1(a); (3) Fischer's clear continued support for the conclusions and findings in his June 23, 2005 advisory opinion; and (4) Fischer's refusal to refer the matter to an ALJ, despite the fact that occasionally in the past applications for special concessionaire permits had been referred to ALJs.
Fischer rejected appellants' request to refer the matter as without basis. With respect to N.J.A.C. 13:2-36.1(a), Fischer said that one of the criteria in that regulation was that the matter involve issues not previously articulated by the Division. While quoting NJRA's appellate brief that his advisory opinion "represent[ed] a novel *754 view of the regulation which apparently was never adopted by the agency before the case at issue", he concluded that no one questioned that the issue was novel.
Fischer did not dispute his continued support of his advisory opinion. While he acknowledged that two years had passed since he issued the advisory opinion, no relative facts had changed. He still believed that special concessionaire permits were available within Xanadu, so long as the applicants established that they were fit to receive the permits and any objectors were given an opportunity to be heard. Finally, Fischer explained that to "expedite the process," he, and not an ALJ, should consider Benihana's application. He said:
Not only do I have almost eight years of experience as Director of the ABC, I am familiar with the history of the issuance of Special Concessionaire Permits by the agency. I must evaluate the exigencies and time constraints of this project and the commensurate public interest demands by resolving disputes in a reasonable time frame. Whether previous ABC Directors decided to transfer matters to the OAL is irrelevant. This is not a basis for recusal.
Even if the matter could be referred to the OAL as a contested case, Fischer said, he would still be the person who would render a final decision in the matter because "an agency head has the exclusive authority to decide contested cases." (Application of County of Bergen, N.J. for Approval to Dissolve Bergen County Utils. Auth., 268 N.J.Super. 403, 414, 633 A.2d 1017 (App.Div.1993)). He concluded that there was no basis for appellants' request that an ALJ decide the matter.
On appeal, appellants maintain their argument. They contend that Fischer's issuing the advisory opinionat the request of the developerwithout first addressing the requirements in N.J.A.C. 13:2-36.1(a) "calls into question the possible bias of the Director in favor of the Developer." Appellants underscore that in the past the Director referred contested cases to the OAL for a hearing before an ALJ and contend that Fischer's refusal to refer this matter to the OAL establishes a basis for his recusal.[1]
More importantly, they say, Fischer's refusal to depart from the findings in his advisory opinion was "inappropriate as a matter of law" and warranted his removal from the case. They draw support from three cases, all of which provide that we may remand a case to a different judge when the trial judge erred and there is concern that the trial judge may be committed to his or her prior findings, citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 617, 512 A.2d 438 (1986), Graziano v. Grant, 326 N.J.Super. 328, 350, 741 A.2d 156 (App.Div.1999), and Carmichael v. Bryan, 310 N.J.Super. 34, 49, 707 A.2d 1357 (App.Div.1998).
Finally, appellants note that Rule 1:12-1(f) requires removal of a decision-maker for any "reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so", citing Sheeran v. Progressive Life Ins. Co., 182 N.J.Super. 237, 243, 440 A.2d 469 (App. Div.1981), where the court applied Rule *755 1:12-1 in determining whether an ALJ had a conflict of interest that required recusal.
ABC and the other respondents contend that Fischer correctly denied appellants' motion for recusal. They rely primarily on In re Carberry, 114 N.J. 574, 556 A.2d 314 (1989), where the plaintiff, a State Police Trooper, was subject to a disciplinary hearing headed by State Police Superintendent Pagano after the plaintiff had tested positive for marijuana use. Id. at 577, 556 A.2d 314.
For the first time on appeal, the plaintiff argued that as commander of the department that lodged disciplinary charges against him, Pagano should have recused himself from presiding over the disciplinary hearing. Id. at 582, 556 A.2d 314. We agreed, finding it was plain error for the superintendent to have heard the case and we remanded the case to the OAL. Ibid.
The Supreme Court disagreed and reversed, finding no facts that demonstrated Pagano's inability to fairly and impartially decide the matter and no basis for us to remand the matter to the OAL. Id. at 584, 556 A.2d 314. The Court explained:
[W]e recognize that conduct of a disciplinary hearing by the agency head might raise some doubts in the mind of the employee whether the hearing officer is impartial. Perhaps those doubts could be allayed if someone other than the Superintendent were to conduct disciplinary hearings. Although the Administrative Procedure Act reserves to an agency head the right to conduct administrative hearings in contested matters, N.J.S.A. 52:14F-8, the agency head may direct that a contested matter be assigned to an ALJ. Consequently, Superintendent Pagano could refer the matter to the OAL for hearing by an ALJ. Even in that context, as the head of the agency, he would retain the power to "adopt, reject or modify the recommended report and decision," N.J.S.A. 52:14B-10(c), or the "findings of fact and conclusions of law" of the ALJ, N.J.S.A. 52:14F-7. Thus the agency head has the power to make the critical decision whether to refer a matter to an ALJ, as well as the power to make the final decision on the merits. The point remains, however, that it is for the agency head to decide initially whether to refer the matter to the OAL.
[T]he right to decide contested cases is an integral part of the administrative process. Administrative agencies carry out their regulatory responsibilities not only through rulemaking, or informal administrative action, but also through adjudication of contested cases. "Thus, the agency's decisional authority over contested cases is directly and integrally related to its regulatory function." To presume that the agency head is biased merely because he or she is applying an agency rule or regulation to a particular employee would severely undermine the function of administrative agencies.
[Id. at 584-85, 556 A.2d 314 (quoting In re Uniform Admin. Procedure Rules, 90 N.J. 85, 93-94, 447 A.2d 151 (1982)) (additional citations omitted).]
While an agency head should decline hearing a matter if he or she is tainted by actual bias, being "familiar with the facts of the case through the performance of statutory or administrative duties" does not make the agency head biased or partial. Id. at 585, 556 A.2d 314. "Nor is disqualification automatically required merely because a decisionmaker has announced an opinion on a disputed issue." Ibid. Rather, "[t]he probability of actual bias is grounds for disqualification when the decisionmaker has a pecuniary interest in the outcome of the matter or has been the target of personal criticism from one seeking relief" so as to form a basis for "a *756 personal vendetta" against the one seeking relief. Id. at 586, 556 A.2d 314.
The Court found that as Carberry had failed to present facts establishing that Pagano had a pecuniary interest in the matter or that Carberry had personally criticized him, there was no proof of actual bias requiring Pagano's removal from the case. Ibid.
ABC contends that appellants here have similarly failed to establish actual bias because Fischer had no pecuniary interest in Benihana's receiving a special concessionaire permit, and there was no proof that appellants had personally criticized Fischer so as to form a basis for a personal vendetta against appellants. We agree.
Fischer's failure to mention N.J.A.C. 13:2-36.1 in his advisory opinion is inconsequential, and we found no impropriety in his issuing the advisory opinion. In re Xanadu Permits, supra, 392 N.J.Super. at 583-84, 921 A.2d 1159. Nor did we find that he erred in concluding that special concessionaire permits were available to Xanadu tenants because Xanadu was state property. Ibid. Fischer's continued support for the conclusions in his advisory opinion was appropriate.
Finally, Fischer had discretion to not refer the matter to the OAL. In re Application of County of Bergen, supra, 268 N.J.Super. at 413, 633 A.2d 1017. That other ABC directors referred similar cases to the OAL is irrelevant. His decision to hold the hearing himself did not establish bias, and he did not err in denying the request for recusal.

II.
Appellants next challenge the adequacy of the hearing that Fischer afforded them claiming, first, as they had a property right in their liquor licenses, a trial-type hearing at which they could object to Benihana's application was required; and second, the hearing did not comply with our earlier directive.
As we have noted, the APA provides that an objector may receive a trial-type hearing before an ALJ if the matter is a "contested case." N.J.S.A. 52:14B-9 and -10. A contested case is a proceeding in which the Constitution or a statute requires an adjudicatory hearing prior to a final decision by the agency head. N.J.S.A. 52:14B-2(b); In re Application of County of Bergen, supra, 268 N.J.Super. at 413, 633 A.2d 1017. Here, no statute granted appellants the right to an adjudicatory hearing. Their claim to a hearing would have to be premised on a constitutional right being at stake.
In his April 22, 2008 order, Fischer issued a preliminary decision that Benihana's application implicated none of appellants' constitutional rights, and they were not entitled to a trial-type hearing. In re Freshwater Wetlands Permits, 185 N.J. 452, 456, 888 A.2d 441 (2006) (concluding that under the APA, a hearing right exists only for a non-applicant to a permit if that third party can demonstrate a particularized property interest of constitutional significance that is directly affected by an agency's permitting decision).
Fischer concluded that, consistent with ABC's past practices, an "appropriate hearing" required only an opportunity for appellants to be heard, not a trial-type hearing. "In general," Fischer explained, "applications requesting the issuance of an alcoholic beverage license or permit must satisfy the issuing authority of the appropriateness of the issuance of such a license or permit, including the fitness of the applicant."
He alluded to the requirements imposed on the municipality when issuing a license, N.J.S.A. 33:1-24, and concluded that the ABC must comply with the same mandates *757 when it considers license and permit applications. A municipality (and according to Fischer, the ABC) is authorized and required
to receive applications for such licenses as such other issuing authority is authorized to issue; to investigate applicants and to inspect premises sought to be licensed; to conduct public hearings on applications and revocations; to enforce primarily the provisions of this chapter and the rules and regulations so far as the same pertain or refer to or are in any way connected with retail licenses, except plenary retail transit licenses; to maintain proper records; to keep full and correct minutes; and to do, perform, take and adopt all other acts, procedures and methods designed to insure the fair, impartial, stringent and comprehensive administration of this chapter.
[Ibid.]
The statute is silent in reference to holding a trial-type hearing for a third-party objector.
"At all times in the [review] process," said Fischer,
the issue is whether the applicant has satisfied the Director that it is qualified and appropriate to receive and operate an alcoholic beverage permit and under what conditions or limitations, if any, this permit is to be operated. The role of the objector is to provide such other information or comment as it has available so as to complete the record in order to assist the Director in making his decision.
The proceeding is not an adversarial dispute between parties, but rather, an administrative action pursuant to a legislative delegation of power.
Fischer rejected Hartz's contention that it had a particularized property interest in its license, finding that our courts have consistently held that a license to sell alcoholic beverages is a temporary permit or privilege, not a right. Butler Oak Tavern v. Div. of Alcoholic Beverage Control, 20 N.J. 373, 381, 120 A.2d 24 (1956); Cavallaro 556 Valley St. Corp. v. Div. of Alcoholic Beverage Control, 351 N.J.Super. 33, 40, 796 A.2d 938 (App.Div.2002) ("It is well accepted that ownership of a liquor license is a privilege and not a property right[.]"). Additionally, Fischer referred to N.J.S.A. 33:1-26, which provides:
In case of death, bankruptcy, receivership or incompetency of the licensee, or if for any other reason whatsoever the operation of the business covered by the license shall devolve by operation of law upon a person other than the licensee, the director or the issuing authority may, in his or its discretion, extend the license for a limited time, not exceeding its term, to the executor, administrator, trustee, receiver or other person upon whom the same has devolved by operation of law as aforesaid. Under no circumstances, however, shall a license, or rights hereunder, be deemed property, subject to inheritance, sale, pledge, lien, levy, attachment, execution, seizure for debts, or any other transfer or disposition whatsoever, except for payment of taxes, fees, interest and penalties imposed by any State tax law for which a lien may attach pursuant to R.S. 54:49-1 or pursuant to the State Tax Uniform Procedure Law, R.S. 54:48-1 et seq., or any similar State lien of tax, except to the extent expressly provided by this chapter.
[(Emphasis added).]
Fischer concluded that appellants had no particularized property interest in their liquor licenses that entitled them to a trial-type hearing. He did schedule a hearing at which appellants could present evidence and arguments challenging Benihana's *758 qualifications to receive a special concessionaire permit. Appellants neither appeared at the hearing nor presented evidence challenging Benihana's qualifications.
At the hearing, Benihana presented two witnesses, one who testified to the Xanadu security plan and how it related to alcohol management and consumption, and the other who testified to the nature of Benihana's business as a family restaurant and the training that it provides its employees on alcohol consumption. Fischer concluded that Benihana had satisfied all of the criteria for receiving a special concessionaire permit, and that it was fit to sell alcoholic beverages.
On appeal, appellants contend that Fischer erred in finding that a liquor license does not create a constitutionally protected property right entitling them to a trial-type hearing.
Appellants rely first on Hills Dev. Co. v. Twp. of Bernards, 229 N.J.Super. 318, 551 A.2d 547 (App.Div.1988), arguing that we held that neighbors of a proposed affordable housing site had a sufficiently particularized property interest, entitling them to a contested case hearing. Appellants misconstrue our decision.
In Hills Dev., we concluded that the neighbors were entitled to a contested case hearing by statute, not by constitutional right. Id. at 336, 340-42, 551 A.2d 547. We noted that due process did not require a trial-type hearing to protect the neighbors' constitutional rights in their real estate because the proposed action (rezoning) did not amount to a taking, and the alleged decrease in value that the affordable housing might cause the neighbors' property did not "signal the invasion of a right protected by due process." Id. at 334-35, 551 A.2d 547.
Similarly in Boss Co. v. Bd. of Comm'rs, 40 N.J. 379, 387-88, 192 A.2d 584 (1963), another case on which appellants rely, the Court addressed the issue of "whether a liquor license and any rights thereunder are property or rights to property within the meaning of section 6321 of the Internal Revenue Code." Id. at 383, 192 A.2d 584. That issue implicated both state law on the nature of a liquor license and federal law on whether a federal lien may attach to the license. Ibid.
With respect to the state law, the Court first looked to N.J.S.A. 33:1-26, which states that "[u]nder no circumstances ... shall a [liquor] license, or rights thereunder, be deemed property[.]" Boss Co., supra, 40 N.J. at 383, 192 A.2d 584. The Court then discussed the nature of a liquor license and the rights that it creates in the licensee:
A liquor license in New Jersey vests a personal right in the licensee to conduct a business otherwise illegal. As such, it is merely a temporary permit or privilege. But once granted, it is protected against arbitrary revocation, suspension or refusal to renew.
This license has valuenot merely the personal value to the licensee that inheres in the right to engage in the business of selling intoxicating liquors, but also the monetary value that arises from the power possessed by the licensee to substitute, with the municipal consent, some other person in his place as licensee. Moreover, in limited situations, the personal nature of the license is sacrificed so that this value can justly accrue to the benefit of third parties. N.J.S.A. 33:1-26 provides that if the operation of the business covered by the license devolves by operation of law upon a person other than the licensee, the issuing authority may, in its discretion, "extend said license for a limited *759 time, not exceeding its term, to the executor, administrator, trustee, receiver or other person upon whom the same has devolved by operation of law as aforesaid." If the license is extended, the holder thereof can exercise the same rights as the original licensee, and by conducting the business or converting the license into money by consenting to a person-to-person transfer, the estate of a deceased licensee will benefit or the assets available for creditors of a financially troubled licensee will be increased. Thus, the liquor license is a legal interest in the nature of an economic asset, created and protected by statute, and because it has monetary value and is transferable, either by consent of the licensee or by operation of law (in the special statutorily-described sense), it possesses the qualities of property.
[Boss Co., supra, 40 N.J. at 384-85, 192 A.2d 584 (internal citations omitted).]
But, the Legislature had clearly stated in N.J.S.A. 33:1-26 that a liquor licenses shall not be deemed property. Boss Co., supra, 40 N.J. at 385, 192 A.2d 584.
The Court recognized that it was presented with "[t]he somewhat unusual situation... [of] whether a liquor license can be classified as `property' for federal purposes despite a legislative pronouncement to the contrary." Ibid. It concluded that it could because a liquor license had value and created interests similar to property interests. Id. at 385-87, 192 A.2d 584. "Thus, as far as the federal government is concerned, N.J.S.A. 33:1-26 cannot immunize liquor licenses from the attachment of federal liens" because "`state law is inoperative to prevent the attachment of liens created by federal statutes in favor of the United States.'" Boss Co., supra, 40 N.J. at 387, 192 A.2d 584 (quoting United States v. Bess, 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135, 1141 (1958)).
Additionally, said the Court, its decision was
consistent with the suggestion of Judge Francis that "the public interest requires liberal interpretation and application of the lien statute [section 6321] because such money is the life blood of government." The liquor license, although transferable, is still to be considered a temporary permit or privilege, and not property, as it always has been, even before our Legislature so declared by statute, and this consideration is to continue to govern the relationship between state and local government and the licensee. Likewise, the vitality of N.J.S.A. 33:1-26 is in no way diminished and will continue to protect the liquor license from any device which would subject it to the control of persons other than the licensee, be it by pledge, lien, levy, attachment, execution, seizure for debts or the like. And finally, the sound discretion of the issuing authority to issue, renew or transfer liquor licenses will not be disturbed, for the seizure by the federal government merely obviates the necessity of securing the consent of the licensee to the transfer.
[Id. at 387-88, 192 A.2d 584 (internal citations omitted).]
Boss Co. provides no support for appellants. A liquor license is "a temporary permit or privilege, and not property ... and this consideration is to continue to govern the relationship between state and local government and the licensee." Ibid. The application of the federal lien law to the license does not alter this basic principle.
Appellants also rely on Sea Girt Rest. & Tavern Owners Ass'n v. Borough of Sea Girt, 625 F.Supp. 1482, 1485-88 (D.N.J.), aff'd, 802 F.2d 445 (3d Cir.1986). There, holders of liquor licenses argued that N.J.S.A. 33:1-47.1, which provides for regulation *760 of the hours of sale of intoxicating liquors by local referendum, violated the licensees' procedural due process rights because it did not afford them notice and an opportunity to be heard. Sea Girt, supra, 625 F.Supp. at 1485.
Relying on Boss Co., supra, 40 N.J. at 384, 192 A.2d 584, the district court concluded that while a liquor license did not create a property right, it did create a property interest that was protected by the Due Process Clause of the Fourteenth Amendment from arbitrary revocation, suspension or refusal to renew. Sea Girt, supra, 625 F.Supp. at 1487. The licensees had a basis for asserting a procedural due process challenge.
The challenge lacked merit, however, because "the referendum process set forth in N.J.S.A. 33:1-47.1 constitutes a fair process of decision-making," Sea Girt, supra, 625 F.Supp. at 1489-90, primarily because it allowed the licensees to be heard by campaigning against the proposed referendum. Id. at 1491. The court explained that procedural due process
does not guarantee a uniform code of procedure. Although the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner, the concept is flexible, calling for procedural protection as dictated by the particular circumstances. In other words, all that is required is "a fair process of decision-making."
[Id. at 1489 (citations omitted).]
The referendum process provided the licensees a fair opportunity to be heard; the statute did not violate the licensees' due process rights. Ibid.
Sea Girt does not offer appellants any support. The decision confirms that a liquor license is not property, but it cannot be revoked, suspended or denied renewal without an adequate opportunity to be heard. Here, Fischer provided appellants an adequate opportunity to be heard by entertaining their various legal arguments and by affording them a hearing, which they notably did not attend.
Appellants challenge Fischer's reliance on In re Freshwater Wetlands Permits, supra, 185 N.J. 452, 888 A.2d 441, in finding that appellants did not have a particularized property interest in their liquor licenses.
The objectors in In re Freshwater Wetlands Permits were neighboring property owners who had filed objections to a developer's application for a Department of Environmental Protection (DEP) permit to fill wetlands. Id. at 455, 888 A.2d 441. They claimed that flooding conditions on their properties would be exacerbated if the developer filled the wetlands. Id. at 455-56, 888 A.2d 441.
Over a two-year period the DEP "extensively examined the issue" by meeting with the objectors, considering their expert reports and conducting on-site inspections. Id. at 456, 888 A.2d 441. Ultimately, the DEP issued the permit, and the neighbors appealed, claiming that to protect their property interests, due process required that they receive a trial-type hearing before an ALJ. Ibid.
The Supreme Court determined that the objectors were afforded not only a full opportunity to be heard by DEP during the extensive permitting process, but also judicial review of the agency's decision granting the permit.
It explained:
Under the Administrative Procedure Act, "all interested persons are afforded reasonable opportunity to submit data, views or arguments, orally or in writing, during any proceedings involving a permit decision." N.J.S.A. 52:14B-3.1(a). *761 In this case, the neighboring homeowners clearly were "interested persons" and had a right to protest the issuance of a permit to fill wetlands on the [developer's] property. As landowners within 200 feet of the affected property, the neighbors received notice and, over a two-year period, submitted to the DEP their data, views, and arguments, both orally and in writing, objecting to the grant of a GP-6 permit. Under the FWPA regulations, they also received a "public hearing," which is "an administrative non-adversarial type hearing before a representative or representatives of the [DEP] providing the opportunity for public comment, but does not include cross-examination." N.J.A.C. 7:7A-1.4.
[Id. at 463, 888 A.2d 441.]
Further, the objectors would have an opportunity to present their objections to the planning board when it considered the developer's drainage system. Id. at 472, 888 A.2d 441. The Court concluded that the process that the neighbors received, and would receive before the planning board, was sufficient to protect their interest without affording them a trial-type hearing before an ALJ. Id. at 471-73, 888 A.2d 441.
The Court underscored that "due process is a flexible and fact-sensitive concept." Id. at 467, 888 A.2d 441. Not every situation requires a trial-type hearing to satisfy its demands. Ibid. Rather, "its demands ... [are] a function of what reason and justice require under the circumstances." Ibid.
We reject appellants' contention that In re Freshwater Wetlands Permits is distinguishable because unlike the objectors there, appellants' claims here are speculative. They claim, without specificity, that issuing Benihana a special concessionaire permit will, in fact, have a negative impact on their property. Instead, they complain that Fischer's refusal to allow them to conduct discovery inhibited their ability to "put in quantifiable terms" the negative effect that issuing the permit will have on their property. Presumably, they are referring to an economic impact, such as loss of profits. Such a contention is speculative, at best.
Appellants cannot predict the future nor contend with any degree of certainty that Benihana's sale of alcoholic beverages on its property will negatively impact their businesses. More importantly, even if they could establish such an impact, that negative effect is irrelevant in deciding whether Benihana is qualified to receive a special concessionaire permit.
In Great Atl. & Pac. Tea Co. v. Point Pleasant Beach, 220 N.J.Super. 119, 129, 531 A.2d 749 (App.Div.1987), we held that in deciding to issue a liquor license, the focus must be on the impact that the license will have on the "public health, safety, morals and general welfare[,]" and that a desire to protect other businesses from economic competition is an impermissible consideration.
We again reiterate the principle that we enunciated in Great Atlantic & Pacific Tea Co., that the economic impact that granting a special concessionaire permit may have on appellants was not relevant in deciding whether Benihana was qualified to receive the permit. The asserted property interest does not entitle appellants to a trial-type hearing.
We also reject appellants' argument that our earlier decision mandated such a hearing. We earlier stated that appellants had to be afforded a hearing sufficient to allow them to "develop and present arguments regarding the validity and appropriateness of the jurisdictional exercise, the accuracy and sufficiency of any of the grounds on which the exercise is to be based, and the impact of the exercise on their legal *762 rights[.]" In re Xanadu Permits, supra, 392 N.J.Super. at 583, 921 A.2d 1159.
In our prior decision, we neither prescribed the nature of the hearing nor established the parameters of matters germane to Fischer's consideration of the application. We said:
To the extent appellants have standing to develop and present arguments regarding the validity and appropriateness of the jurisdictional exercise, the accuracy and sufficiency of any of the grounds on which the exercise is to be based, and the impact of the exercise on their legal rights, they cannot be denied a fitting opportunity to do so on the administrative agency level. That right is recognized in the regulation itself governing the application process for special concessionaire permits, which establishes that any objectors must be afforded the opportunity for a hearing. On its face, that regulation contains no special standing criteria that an objector must meet. It presupposes that a hearing will be held if "a duly signed written objection to the issuance of a special concessionaire permit" is received by the Director. Precluding any objector with real standing from challenging the exercise of special-concessionaire-permit jurisdiction, or from raising any other grounds pertinent to such an application, would deny it a basic opportunity to protect its property interests.
....
We find no fault with the Director's assertion of subject matter jurisdiction as a way of beginning the evaluative process, but the underlying issues may not proceed to final resolution on the administrative level before the objections raised by appellants receive an appropriate hearing. That opportunity is assured by N.J.A.C. 13:2-5.2. To be certain these appellants' rights are exercised in a timely and sufficient manner, they should receive specific notice of the applications from the Director, in addition to the notice by publication provided in subsections (c), (d), and (e) of the regulation.
[In re Xanadu Permits, supra, 392 N.J.Super. at 583-84, 921 A.2d 1159. (citations omitted).]
Nothing we said mandated a trial-type hearing. Given appellants' limited interest in their liquor licenses and the speculative nature of their claim that Benihana's permit will negatively impact their businesses, Fischer appropriately declined appellants' request for a trial-type hearing.
We likewise reject appellants' claim that in considering their objections, Fischer "improperly prohibited" them "from developing arguments" regarding whether (1) Benihana had entered a contract with NJSEA; (2) NJSEA had effectively ceded control of Xanadu to the developer; (3) the building in which Benihana would operate was a public building, as that term is used in N.J.A.C. 13:2-5.2; (4) other special concessionaire permits throughout the State were allowed to sell alcoholic beverages without limitations; and (5) the issuance of a special concessionaire permit to Benihana will impact appellants' property rights.
Fischer did not consider whether others who hold special concessionaire permits are allowed to sell alcoholic beverages without limitations, as that issue had no relevance to the criteria for receiving a special concessionaire permit. He considered and decided the other presented issues.
That Fischer decided those four issues on the briefs and evidence submitted to him prior to the hearing is insignificant. Administrative disputes may be summarily decided when they do not involve disputed facts. Contini v. Bd. of Educ. of Newark, *763 286 N.J.Super. 106, 120, 668 A.2d 434 (App.Div.1995) (providing that summary decisions may be issued in administrative disputes, even when the disputes rise to the level of contested cases), certif. denied, 145 N.J. 372, 678 A.2d 713 (1996); In re Farmers' Mut. Fire Assurance Ass'n of N.J., 256 N.J.Super. 607, 618, 607 A.2d 1019 (App.Div.1992) ("An evidentiary hearing is mandated only when the proposed administrative action is based on disputed adjudicatory facts."). There were no disputed facts related to these issues and Fischer properly disposed of them.
We find no merit in appellants' claim that Fischer erroneously precluded them from "inquir[ing] into the relationship of the NJSEA to the Xanadu Project" by relying on principles of collateral estoppel and res judicata. Fischer correctly included in his order that he would not "review the appropriateness of the entire Meadowlands Xanadu Project" because we had addressed the issue and had concluded that NJSEA had authority to undertake the Xanadu project. Fischer was under no obligation to revisit the issues addressed and resolved by us in Hartz Mountain Indus., Inc. v. N.J. Sports & Exposition Auth., 369 N.J.Super. 175, 187-88, 848 A.2d 793 (App.Div.) (providing that by statute, NJSEA is authorized to undertake the Xanadu project), certif. denied, 182 N.J. 147, 862 A.2d 56 (2004).
Fischer refused to entertain appellants' arguments on the appropriateness of the Xanadu project because those arguments were not relevant to whether Benihana was qualified to receive a special concessionaire permit and because Fischer had no jurisdiction to decide the propriety of the Xanadu project. Fischer said:
I do not find that the provision in N.J.A.C. 13:2-5.2 that requires me to determine whether Benihana['s] application for a Special Concessionaire Permit should be granted, also mandates that I review the appropriateness of the entire Meadowlands Xanadu project. This, however, seems to be exactly what the objectors are requesting ... [by raising as an issue] whether Meadowlands Xanadu falls within the scope of NJSEA's statute and whether NJSEA has ceded control over Xanadu to the developer. Issues addressing the nature of the agreement between the developer and the NJSEA or challenging their agreement are not properly before me.
My role as ABC Director cannot function as a collateral attack on another agency's duly considered and enacted project. I do not, and cannot, set policy for other state agencies. Yet, the objectors ask me to accept arguments which have the effect of overruling the decisions of the NJSEA and potentially end[ing] the Meadowlands Xanadu project. The jurisdiction for a review of these NJSEA determinations does not lie at the ABC.
Citing Hartz Mountain Indus., supra, 369 N.J.Super. at 192, 848 A.2d 793, Fischer noted that "the Appellate Division has already completed such a review and found that the NJSEA had the authority to select the Xanadu project." He was correct in his analysis.
Finally, we reject appellants' complaint that Fischer did not allow them to conduct discovery and cross-examine witnesses, thereby prejudicing their ability to oppose Benihana's application. They do not explain how they were prejudiced by the lack of discovery or what information they wanted to discover, other than to say that because they did not have a copy of Benihana's lease, they "were unable to address, among other things, the financial interest of the Developer in Benihana's Special Concessionaire Permit."
*764 In sum, the hearing opportunity afforded appellants is consistent with our earlier instruction that appellants be afforded a hearing and "fitting opportunity" to be heard on the relevant issues. They were afforded that opportunity and chose not to participate. They cannot be heard to complain at this stage of the proceeding.

III.
Appellants next contend that Benihana did not satisfy the following two requirements contained in N.J.A.C. 13:2-5.2(a) to receive a special concessionaire permit: (1) the applicant has entered a contract with the State or its political subdivision authorizing the applicant to sell alcoholic beverages, (2) in any public building or on property owned by, or under the control of, the State or its political subdivision.
Fischer found that Benihana had satisfied these criteria because on August 9, 2007, NJSEA and Benihana had entered into an agreement authorizing Benihana to sell alcoholic beverages on property that NJSEA owned, and NJSEA retained sufficient control and oversight of the Xanadu project, pursuant to the terms of its ground lease with the developer.[2]
On appeal, appellants do not dispute that NJSEA and Benihana entered into a contract on August 9, 2007. Rather, they argue that the contract is invalid for lack of consideration. They refer to the contract's provision that "consideration consisted of the NJSEA's obligation to grant a subtenant [of the developer] the right to sell and serve alcoholic beverages and cooperate in procuring" a special concessionaire permit. Appellants urge that pursuant to the ground lease between NJSEA and the developer, NJSEA was already obligated to do those things.
This argument is without merit. In the ground lease, NJSEA had agreed to cooperate with the developer's subtenants' efforts to obtain a special concessionaire permit if the subtenant convinced NJSEA that it satisfied the criteria for receiving a special concessionaire permit and if the sale of alcoholic beverages in the requested location complied with the master plan for the Xanadu project. NJSEA was not required to sign an agreement with a subtenant if the subtenant did not meet those conditions. In entering an agreement with a subtenant, NJSEA's consideration was a waiver of the right to not have alcoholic beverages served on its property.
Appellants contend that the contract between NJSEA and Benihana was a "`sham' created to perpetuate the illusion of a duly formed contractual relationship that does not exist, and does not at all resemble the kind of contractual relationship which the regulation was designed to address." They claim that "[t]he archetypal example of such a contractual relationship would be the relationship between the NJSEA and the beer vendors at a stadium: the classic, intended purpose for the Special Concessionaire Permit."
We quickly dispose of this argument. NJSEA and Benihana entered the contract to satisfy the requirements of N.J.A.C. 13:2-5.2(a). If that rendered the contract a sham, every contract entered for purposes of receiving a special concessionaire permit would be a sham. To the extent appellants challenge the agreement because Benihana is not NJSEA's direct tenant, but rather a subtenant of the developer's, that challenge also lacks merit. Nothing in the relevant statutes and regulations *765 precludes a subtenant from applying for a special concessionaire permit.
Next, appellants challenge Fischer's finding that Benihana established the state-property criterion. Fischer found that Benihana had satisfied this criterion because the real estate on which the building that Benihana occupied was owned by NJSEA, and NJSEA retained control over the building by way of its control and oversight of the Xanadu project. He explained that the ground lease between NJSEA and the developer provided that during the seventy-five-year term of the lease, the developer would own the buildings located on the real estate. But when the lease expired, NJSEA would own the buildings in fee simple. Appellants argued that the developer's ownership of the buildings, coupled with the fact that the lease was long-term, effectively divested NJSEA of its ownership rights in the property, but Fischer disagreed. NJSEA had no obligation to renew the lease at its expiration, and at its expiration, the developer would be divested of its ownership rights in the buildings.
Appellants now claim that Fischer misconstrued the meaning of the state-property criterion. According to appellants, N.J.A.C. 13:2-5.2(a)'s providing that the proposed sale of alcoholic beverages must take place "in any public building or on any property owned by or under the control of the State" means that the sale must take place either in a public building, which all agree is not the case here, or on property, such as a marina or entertainment facility, located outside of or adjacent to a public building. Benihana is not located outside of or adjacent to a public building, and it is not a marina or entertainment facility. Appellants reason Benihana failed to satisfy the state-property criterion.
To support their interpretation of the state-property criterion, appellants rely on prior amendments to N.J.A.C. 13:2-5.2 and accompanying comments. N.J.A.C. 13:2-5.2 was first adopted in 1979. At that time the regulation did not allow for the sale of alcoholic beverages for off-premises consumption. 18 N.J.R. 545 (March 17, 1986). In 1986, the regulation was amended to allow for off-premises consumption to accommodate retailers located within Penn Station, Newark, which the New Jersey Transit Authority had acquired in 1986. Ibid. In relation to that amendment, the regulation was changed to refer to the sale of alcoholic beverages "in any public building owned by or under the control of" the State or its political subdivision, instead of "property" owned by the State. Ibid.
In 1990, N.J.A.C. 13:2-5.2 was again amended "to allow and permit consumption in not only a public building but on any property owned by or under the control of the political subdivision." 22 N.J.R. 1813 (June 18, 1990). The ABC explained: "This amendment is proposed since on several occasions the proposed lease of the premises includes property immediately adjacent to the building, such as a marina or entertainment facility." Ibid. Appellants contend that this comment shows that the "on any property owned by the State" language refers only to property, like marinas and entertainment facilities, that are immediately adjacent to the public building.
As did Fischer, we reject this argument. Fischer explained that marinas and entertainment facilities were merely examples of the types of properties that could be adjacent to public buildings. The regulation did not limit the types of properties that qualified as "any property." Rather, Fischer said, the amendment expanded the types of property that qualified as state owned or controlled. But even if appellants' *766 restrictive reading of N.J.A.C. 13:2-5.2(a) were correct, Benihana satisfied the criterion because Xanadu was an entertainment facility.
The amendments and comments to N.J.A.C. 13:2-5.2(a) do not support appellants' restrictive reading of the regulation but rather demonstrate that the regulation was expanded to first allow for the sale of alcoholic beverages for off-site consumption (the 1986 amendment) then to allow for the sale of alcoholic beverages on any property owned by or under the control of the State or its political subdivision (the 1990 amendment). Here, NJSEA owned the real estate; the regulating requirements were met.
Appellants dispute that the real estate on which Benihana was located was owned by NJSEA, arguing that the seventy-five-year lease in this case effectively created a fee simple ownership interest in the developer.
We reject this argument; the lease did not divest NJSEA of its ownership rights because it had a definitive end date, it was not perpetually renewable, and NJSEA had no obligation to renew it.
Finally, appellants challenge Fischer's finding that NJSEA retained control over the property. They contend that the ground lease requires the NJSEA to enter into a concessionaire agreement with the developer's subtenants so long as the subtenant satisfies the prerequisites stated in the ground lease. But, appellants say, NJSEA does not have "the right to designate which premises may be permitted to sell alcohol nor the right to grant approval to an individual tenant or operator prior to its application to ABC." This lack of control, coupled with the length of the ground lease, demonstrates that NJSEA does not retain ownership or sufficient control over the property to satisfy the second criterion in N.J.A.C. 13:2-5.2(a).
This argument lacks merit as well. Even if NJSEA lacked sufficient control over the property, Benihana nonetheless satisfied the state-property criterion because NJSEA owns the real estate. Fischer correctly found that NJSEA retained control over the property because the ground lease required the developer to redevelop the property in accordance with the Xanadu master plan, and NJSEA had the right to inspect the property for compliance.

IV.
Finally, appellants contend that issuing a special concessionaire permit to Benihana violates the policy of the ABC Act. They cite N.J.S.A. 33:1-12.14, which limits the number of plenary retail consumption and seasonal retail consumption licenses within a municipality by the population within the municipality and contend that granting special concessionaire permits to Xanadu tenants will result in an excess number of retailers selling alcoholic beverages within a municipality. They complain that Fischer's decision to issue special concessionaire permits to Xanadu tenants will effectively make it "easier to sell alcohol on property owned by a State Entity than on property privately owned." They underscore that plenary licenses to sell alcoholic beverages are expensive, but special concessionaire permits cost a mere $2,000.
We easily dispose of this argument. The Director's authority to issue a special concessionaire permit comes directly from the ABC Act, namely N.J.S.A. 33:1-42, which provides:
No sales of alcoholic beverages shall be made in any public buildings belonging to or under the control of the state or any political subdivision thereof except as to the national guard as hereinbefore provided, and except as permitted by *767 the commissioner in specified cases and subject to rules and regulations.
Appellants' contention that issuing special concessionaire permits is somehow inconsistent with the ABC Act is baseless. The Legislature's intent is clear and explicit.
We conclude that Fischer correctly issued the special concessionaire permit to Benihana, and his determination was not arbitrary, capricious or unreasonable.
Affirmed.
NOTES
[1] Referring to In re Application of Bayshore Rest. Group, LLC, ABC 8787-03, initial decision, 2004 WL 812747 (March 24, 2004) (also published at 2004 N.J. AGEN LEXIS 180), and In re Dunn, 10 N.J.A.R. 1 (Div. Alcoholic Beverage Control 1984), in which ABC directors referred to ALJs applications for special concessionaire permits.
[2] Benihana was a subtenant of the developer, and the developer was a direct tenant of NJSEA.