**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2541-18T3

JOSEPH P. CARNEY
and CARNEY'S, INC.,

 Plaintiffs-Appellants,

v.

MAYOR EDWARD MAHANNEY,
JR., and THE CITY OF CAPE MAY,

 Defendants-Respondents.

_____

   Submitted March 16, 2020 – Decided July 15, 2020

   Before Judges Rothstadt and Moynihan.

   On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0119-16.

   Jacobs & Barbone, PA, attorneys for appellants (Louis Michael Barbone, on the brief).

   Gemmel Todd & Merenich, PA, attorneys for respondents (Robert P. Merenich, on the brief).

PER CURIAM

Plaintiffs Joseph P. Carney and his company, Carney's Inc. (Carney's), a bar in Cape May, appeal from a January 2, 2019 order granting defendants', Mayor Edward Mahanney, Jr. and the City of Cape May, motion for summary judgment and dismissing plaintiffs' complaint. The matter arose after a fight occurred at Carney's that resulted in the bar being shut down prior to its 3:00 a.m. closing time. In their complaint, plaintiffs claimed, among other assertions, that Mahanney ordered the bar's closing and in doing so violated the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-2(c).

In a comprehensive forty-one page written decision, Judge Christopher Gibson found that Mahanney did not order the closing, but even if he did, the evidence did not demonstrate a violation of the NJCRA because Mahanney's conduct was not "'egregious' government action that 'shock[ed] the conscience.'" On appeal, plaintiffs argue that the parties' dispute over whether Mahanney ordered Carney's to close for the night was a genuine issue of material fact that should have prevented summary judgment from being entered as to their NJCRA claim. We disagree and affirm, substantially for the reasons expressed by Judge Gibson in his thorough decision.

The facts viewed in a light most favorable to plaintiffs are summarized as follows. Carney's was operated under a plenary retail license. The assault that

gave rise to this action between a patron and a bartender occurred on September 14, 2014, and resulted in numerous injuries to the participants, the patron's arrest, and the discharge of the bartender. After police responded to the scene, Carney's closed at approximately 2:00 a.m., even though the bar's scheduled closing time was 3:00 a.m.

According to plaintiffs, prior to the closing, a police sergeant first approached Carney and told him that "the mayor told [him] to shut [Carney's] down," then "the mayor . . . came over, [and] told [Carney] to close down again." In response, Carney told Mahanney he did not "know if [Mahanney] ha[d] that authority." Mahanney implied that he did and informed him that if he closed Carney's for the night, he would not call the Alcoholic Beverage Commission (ABC). According to Carney, he then told Mahanney the following:

> Mr. Mayor, I don't believe that to be true. I believe you will call the ABC regardless of whether I close down or not. But as the governing mayor of this town, I'm going to show you some respect and I'm going to close Carney's down and stop the music and . . . ask the folks to leave.

The following Monday, an ABC officer visited Carney's. No action was taken by the ABC until November 24, 2014, when it suspended plaintiffs' license

3

for thirty-six days for the incident. The suspension was not Carney's first, as its license had been suspended several times for serving under-aged patrons.

Plaintiffs' license was renewed in June 2015 subject to numerous proposed conditions. The ABC's letter setting forth the conditions also stated that plaintiff could request a hearing on the imposition of the conditions. Plaintiffs requested a hearing, which was held before the city council on June 30, 2015. At the meeting, the members of the council discussed Carney's alleged history of seventy-eight calls for service during the period from January 1, 2014 to September 15, 2014. Those calls included: fifteen disorderly incidents, one noise complaint, seven EMS calls, one drug violation, one theft, two simple assaults, two aggravated assaults, one sexual assault, one ABC investigation, and forty-seven general calls. Due to the September 14, 2014 incident, and the numerous past service calls, especially the sexual assault allegation, the proposed conditions were implemented despite plaintiffs' objections.

Plaintiffs did not appeal from the special conditions, instead, they filed their complaint in this action, which they later amended. The first count alleged that defendants violated the NJCRA by ordering Carney's to shut down early on September 14, 2014, without due process, and causing injury to plaintiffs' reputation by publishing at the council meeting that Carney's had seventy-eight

calls for service to the police. In the second count, they alleged a violation of the NJCRA for "unequal and/or disparate treatment" of Carney's.

During discovery, Carney, Mahanney, and the police sergeant, who responded to the September 2014 incident, were deposed about the closing of Carney's that night. Carney denied that there was an agreement that night between him and Mahanney about closing Carney's. He stated that he did not know whether Mahanney had the authority to close Carney's, although he learned later Mahanney did not, "but, out of respect [for] the law, [he] took him at his word that he might be . . . a person who could tell [him] to shut down." Additionally, while describing his conversation with the sergeant at the scene, Carney stated that the officer

> for sure, heard the mayor say, okay, [Carney], I'll tell you what, if you shut your doors down now, I won't call the ABC. And I said, well, I'm not sure that I believe that, but, [sergeant], you heard it. And the mayor . . . stuck out his hand to shake mine, which I did out of respect.

Carney also stated that despite the handshake, he believed Mahanney still called the ABC, but confirmed he did not have proof to support this claim.

During Mahanney's deposition, he confirmed that he had no authority to shut down any bar as that power was within the jurisdiction of the ABC, which had a designated officer responsible for enforcement. According to Mahanney,

5

the only action he ever took when confronted by a violation was to inform the city's manager.  He also explained that the city council was only involved in license renewals and transfers.

Addressing the night of the incident, Mahanney indicated that he was on his way home from a late night at work, when he decided to drive past the bars. After he saw a brawl taking place outside of Carney's at approximately 1:15 am, he decided to stop, get out of his car, and see what was happening.  Mahanney was just standing around watching, when the sergeant came over to talk to him. During their conversation, Mahanney asked whether the officer was going to close Carney's for the night as the commotion outside of Carney's was "really tenuous."  After checking with another sergeant, the officer informed Mahanney that the police department lacked that authority.

Mahanney stated that at approximately 1:55 a.m., he had a conversation with Carney, who informed him that he planned to close for the night around 2:00 a.m. if Mahanney promised not to contact the ABC.  Mahanney denied ever saying that he was going to close Carney's early or that he had the authority to do so.  He also denied calling the ABC or having someone call on his behalf after the incident.  He understood that a police detective contacted the ABC.

6

During the responding sergeant's deposition, he stated that he contacted another officer who informed him that the police did not have the authority to shut down Carney's on the night of the incident. In relation to Carney's and Mahanney's conversation that night, he testified that he overheard the two "c[o]me to an agreement that . . . [Carney] would close [Carney's] a half hour early," so long as Mahanney agreed not to contact the ABC. He also testified that Mahanney never ordered Carney's to close early.

On September 28, 2018, defendants filed a notice of motion for summary judgment. After considering the parties' oral arguments on November 16, 2018, Judge Gibson later issued the January 2, 2019 order granting summary judgment as well as his written decision. This appeal followed.

We review a court's grant of summary judgment de novo, applying the same standard as the trial court, without affording any deference to that court's legal conclusions. RSI Bank v. Providence Mut. Fire Ins., 234 N.J. 459, 472 (2018). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. of Pittsburgh, 224 N.J.

189, 199 (2016) (quoting R. 4:46-2(c)). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)); accord R. 4:46-2(c).

On appeal, plaintiffs argue that the determination of the NJCRA claim depended upon whether Mahanney ordered Carney to close his business, and therefore, there "was a material and disputed fact" that should not have been determined on summary judgment. They claim that the government's entry into Carney's and Mahanney's subsequent order to shut down, deprived Carney of his "constitutional rights, his statutory privileges and his substantive due process rights." In the alternative, plaintiffs argue that even if this was not a constitutional seizure, defendants' acts "deprived [Carney] of a vested 'privilege' to operate his bar." Relying on Felicioni v. Admin. Office of the Courts, 404 N.J. Super. 382, 392 (App. Div. 2008), abrogated in part by Perez v. Zagami, LLC, 218 N.J. 202, 209-12 (2014), plaintiffs also assert that there was a violation of Carney's substantive due process rights. We disagree.

A-2541-18T3

The New Jersey Constitution, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." N.J. Const. art. I, ¶ 7. Under the NJCRA, a party "may bring a civil action for damages and for injunctive or other appropriate relief" if they have

> been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law.
>
> [N.J.S.A. 10:6-2(c).]

The NJCRA provides a remedy for the violation of substantive rights, not the right to procedural due process. Tumpson v. Farina, 218 N.J. 450, 477 (2014). The NJCRA was enacted to provide, "a remedy for the violation of substantive rights found in our State Constitution and laws." Id. at 474. "[S]ubstantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity.'" Felicioni, 404 N.J. Super. at 392 (second, third, and fourth

alterations in original) (quoting Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 366 (1996)); see also Filgueiras v. Newark Pub. Sch., 426 N.J. Super. 449, 469 (App. Div. 2012).

Unlike the right to own property, the ability to operate a specific business is "not protected by substantive due process." Wrench Transp. Sys., Inc. v. Bradley, 340 F. App'x 812, 815 (3d Cir. 2009); [1] State v. Badr, 415 N.J. Super. 455, 470 (App. Div. 2010) (explaining that a business owner's right to "operate a hookah bar [did] not implicate a fundamental right"). Operating a business under a liquor license does not alter the protections afforded by the statute. A "liquor license, although transferable, is . . . a temporary permit or privilege, and not property." Boss Co. v. Bd. of Comm'rs of Atl. City, 40 N.J. 379, 387 (1963); see also In re Xanadu Project at the Meadowlands Complex, 415 N.J. Super. 179, 195, 198, 210 (App. Div. 2010) (affirming an ABC director's finding that a liquor license did "not create a constitutionally protected property right"). Further, the license is not a privilege secured by the Constitution. See Cavallaro 556 Valley St. Corp. v. Div. of Alcoholic Beverage Control, 351 N.J. Super. 33, 40 (App. Div. 2002) (explaining that there were "no constitutional implications

---

[1] We turn to federal law for guidance because the NJCRA is based upon the federal Civil Rights Act, 42 U.S.C. § 1983. See Tumpson, 218 at 474.

present" when dealing with "a liquor license [as the ownership of the license] is a privilege and not a property right").

However, a license is protected by N.J.S.A. 33:1-26. The statute will protect a license "from any device which would subject it to the control of persons other than the licensee, be it by pledge, lien, levy, attachment, execution, seizure for debts or the like." Kalogeras v. 239 Broad Ave., L.L.C., 202 N.J. 349, 362 (2010) (quoting Boss Co., 40 N.J. at 388). While a liquor license is not property, "it cannot be revoked, suspended or denied renewal without an adequate opportunity to be heard." Xanadu Project at the Meadowlands Complex, 415 N.J. Super. at 199. Only the director or another issuing authority of the ABC has the authority to revoke a license. N.J.S.A. 33:1-31 ("Any license, whether issued by the director or other issuing authority, may be suspended or revoked by the director, or the other issuing authority may suspend or revoke any license issued by it . . . ."). The opportunity to be heard gives rise to a right to procedural due process that is not protected by the NJCRA. Mattson v. Aetna Life Ins., 124 F. Supp. 3d 381, 390 (D.N.J. 2015), aff'd, 653 F. App'x 145 (3d Cir. 2016); see also Tumpson, 218 N.J. at 477.

Here, there was no dispute that Mahanney did not have authority to close Carney's at any time. Further, as correctly found by the motion judge, Carney's

testimony pertaining to negotiations to close down Carney's early was not enough to meet the standard for summary judgment. However, whether there was an agreement between Mahanney and Carney is immaterial because even if Mahanney ordered plaintiff to close Carney's, there was no substantive due process right violated. Even if there was, we agree with Judge Gibson that, under the circumstances of that evening, closing the bar early was not egregious and did not shock the conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

12