IN THE MATTER OF GENERAL DISCIPLINARY HEARING OF TROOPER THOMAS M. CARBERRY.

Argued October 12, 1988—Decided April 13, 1989.

576

*Sheree E. Reinhardt,* Deputy Attorney General, argued the cause for appellant, State of New Jersey (*Cary Edwards, Jr.,* Attorney General of New Jersey, attorney).

*Donald W. Morrow* argued the cause for respondent, Trooper Thomas M. Carberry (*Morrow, Benbrook & Curzi,* attorneys; *Donald W. Morrow, Cynthia J. Jahn,* and *Susan Russo,* on the briefs).

*James Katz* submitted a brief on behalf of *amicus curiae* American Civil Liberties Union of New Jersey (*Tomar, Seliger, Simonoff, Adourian & O'Brien*, attorneys).

*John V. Jacobi* and *Susan Remis Silver,* Assistant Deputies Public Advocate, submitted a brief on behalf of *amicus curiae* Public Advocate of New Jersey (*Alfred A. Slocum,* Public Advocate, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

The issue on this appeal is whether an agency head's conducting of a hearing to discipline an agency employee constitutes a denial of due process to the employee. More specifically, the question is whether State Trooper Thomas M. Carberry was denied due process because the hearing to discipline him was conducted by Colonel Clinton Pagano, the superintendent of the New Jersey Division of State Police (Division). After that hearing, Superintendent Pagano determined that Trooper Carberry had violated the rules and regulations of the Division by failing "to promptly report and take proper police action * * *," and by behaving "in an unofficial or private capacity to the personal discredit of the member or to the discredit of the Division." At the agency level, Carberry did not challenge Superintendent Pagano's right as the agency head to conduct the administrative hearing. Before the Appellate Division, however, Carberry successfully argued that the Superintendent should not have heard the matter. Consequently, that court remanded the matter to the Office of Administrative Law (OAL) for a rehearing. We granted certification, 109 *N.J.* 507 (1988). We now modify the judgment of the Appellate Division and remand the matter to the Superintendent for a rehearing.

–I–

As head of the Department of Law and Public Safety, the Attorney General is the chief law-enforcement officer in the

State. *N.J.S.A.* 52:17B-2. In that capacity, the Attorney General is required "to formulate and adopt rules and regulations for the efficient conduct of the work and general administration of the department, its officers and employees." *N.J.S.A.* 52:17B-4d. The Division is established in the Department of Law and Public Safety, with the superintendent as the executive and administrative head of the Division. *N.J.S.A.* 52:17B-7. The Division satisfies the definition of "state agency" under the Administrative Procedure Act, *N.J.S.A.* 52:14B-2(a), and the superintendent, as the individual constituting the highest authority within the agency, is "the head of the agency" under that Act, *N.J.S.A.* 52:14B-2(d). As the head of the Division, the superintendent sets Division policy, *N.J.S.A.* 53:1-10, and subject to the approval of the Governor, makes the "rules and regulations for the discipline and control" of state police officers. *Ibid.* Consequently, the superintendent has the ultimate responsibility for maintaining discipline among state police officers. The weight of that responsibility becomes apparent on considering that state troopers are authorized to carry firearms, *N.J.S.A.* 2C:39-5 to -6(3), to use deadly force under justifiable circumstances, *N.J.S.A.* 2C:3-7, and to enforce law and order throughout the state. Given those responsibilities, the need of the superintendent to maintain discipline among the troopers is obvious. Equally obvious is the need for the troopers to remain drug free. The use of illegal drugs is incompatible with the integrity of the State Police and with the ability of troopers to perform their duties.

In February 1985, the Division initiated a "Well-Trooper Program." The program, a form of preventive medicine, was designed to detect cardiac deficiencies, and required troopers to undergo various medical tests, including urinalysis. The announcement of the program did not indicate that urine samples would be screened for controlled dangerous substances, such as marijuana. Carberry, who had been employed by the Division for thirteen years, reported for his physical on March 29, 1985.

Without his knowledge, a sample of his urine was tested for drugs by a commercial laboratory.

The laboratory used a test known as the Enzyme Multiplied Immunoassay Technique (EMIT) test, which detects the presence of cannabinoids, the metabolites of marijuana. A positive EMIT test indicates the possibility of marijuana cannabinoids in a specimen, a possibility that can be confirmed through a gas-chromatography/mass-spectrometry test (GC–MS), which more accurately reveals the presence of marijuana.[1] Test re-

---

[1] The Superintendent described the two tests in his findings of fact, conclusions of law, and discipline:

In plain terms, and not disputed by defense expert testimony, the procedures and technical instrumentation seek the presence of metabolites indicative of marijuana.

A urine specimen is first processed through a screening instrument commonly referred to as an EMIT (Enzyme Multiplied Immunoassay Technique) and antibodies which are relatively specific to marijuana are added to the sample. If there are marijuana metabolites present in the urine there is a reaction to the antibodies.

The EMIT measures whether the reaction is taking place and to what extent.

If a positive finding is reached the sample is further processed through more sophisticated instrumentation for verification.

The suspect sample is thereafter injected into a Gas Chromatograph which separates the components of the mixture.

The components then pass through a Mass Spectrometer in pure form and high energy electrons are aimed at the molecules of the component causing the molecules to fragment. As the molecule breaks apart the fragmentation forms a pattern which is reproducible and specific for that compound. The instrument produces a display of the fragmentation pattern and matches it against a standard. The chemist specifically scans for delta–9–THC Carboxylic Acid.

The metabolite of interest is separated by the Gas Chromatographic column and its concentration is determined by the relative response of the Mass Spectrometer as compared to an internal standard. At this juncture the Mass Spectrometer identifies the metabolite specifically.

The State Police process is intended to seek the *presence* of the suspect metabolites in keeping with the prohibition against usage by enlisted members. The Laboratory Analysis reports entered into evidence during this hearing indicate that the Carberry specimen was positive for delta–9–THC Carboxylic Acid and that it measured at the 10 nanogram per milliliter level [on the Gas Chromatograph/Mass Spectrometer].

sults are measured in nanograms per milliliter. A nanogram is one-thousandth of a millionth of a gram. Pursuant to the Division's "protocol," or procedure in effect at the time of Carberry's test, twenty nanograms was the cut-off point for a positive EMIT test, subject to confirmation by GC–MS analysis. Twenty nanograms is a low cut-off point, the selection of which the Division justifies by stating that it is interested not only in whether a trooper is impaired but also whether he or she is using drugs to any extent. If the EMIT test contains fewer than twenty nanograms, the Division deems the test negative for marijuana. Although Carberry's test result revealed forty to fifty nanograms, thereby exceeding the twenty-nanogram threshold, the Division did not confirm that result through GC–MS analysis.

Instead, the Division requested Carberry to report to the State Police laboratory at Sea Girt, where, on August 8, 1985, he was informed that his first urine sample tested positive for drugs and that he was under investigation for having violated Division regulations. On request, he submitted a second urine sample. An EMIT test performed that day by the State Police laboratory revealed an estimated twenty-six nanograms. GC–MS analysis confirmed the presence of marijuana. In accordance with standard Division procedure, Carberry signed an acknowledgment that he had been informed of his rights as the subject of an internal investigation. He was not told, however, that he could retain a portion of his specimen for independent testing. Nor did the State Police laboratory preserve any of his specimen. On the next day he was informed that his test results were positive for marijuana. Carberry explained that he had never smoked marijuana, but that in the course of his duties he had handled marijuana seeds on two occasions during the preceding weeks. He also said that once, five days earlier,

---

For alternative explanations of the test, see A. Moensseens, F. Inbau, and J. Starrs, *Scientific Evidence in Criminal Cases* §§ 6.02 to 6.05, at 328–34 (3rd ed. 1986); *Gradwohl's Legal Medicine* at 561–64 (3rd ed. 1976).

he had been in a van where others had been smoking marijuana.

Based on the test results and Carberry's admitted failure to take any action against those smoking marijuana in the van, Superintendent Pagano immediately suspended him. The Division filed charges on October 11, 1985, alleging that Carberry had violated Article V, Section 7 of the Division's rules and regulations, which provides:

The failure on the part of a member while on duty or on authorized absence from duty, and whether in uniform or not, to promptly report and take proper police action in any situation reasonably requiring such action, is neglect of duty,

and Article VI, Section 2b, providing:

No member shall: Act or behave in an unofficial or private capacity to the personal discredit of the member or to the discredit of the Division.

Carberry pled not guilty, and the matter proceeded to a hearing before Superintendent Pagano. Carberry, who was represented by counsel, did not request that Superintendent Pagano recuse himself or that he refer the matter to the OAL. Instead, Carberry contended that the test of his second urine specimen was unreliable because the EMIT test had revealed a low level of cannabinoids, which in turn produced an unreliably low GC–MS reading. He also questioned the accuracy of the mass spectrometer and of the GC–MS procedure.

Both the Division and Carberry produced experts to testify about the testing procedures. Dr. Richard Saferstein, who had designed the Division's protocol, testified that the procedures reliably detected the presence of marijuana in the urine and that Carberry's results indicated that the trooper had used the substance. Carberry's expert, Dr. Arthur McBay, challenged the reliability of the Division's protocol, and testified that more accurate tests should be used when an employee's career depended on the results. Superintendent Pagano resolved the dispute between the two experts by accepting Dr. Saferstein's testimony and concluding that the positive results from the first and second urine tests indicated "continued use" of mari-

juana. The Superintendent further concluded that this violation of Division policy and the failure to take appropriate action in the van incident justified termination of Carberry's employment.

Carberry appealed to the Appellate Division. *R.* 2:2–3(a)(2). While the appeal was pending, in October 1986, the Attorney General established uniform state-wide drug-testing guidelines to "maintain the drug-free law enforcement community and at the same time safeguard the rights of individual police officers." Attorney General, *Law Enforcement Drug Screening Guidelines*, Memorandum, Oct. 22, 1986, at 1. The Attorney General did not direct that the Law Enforcement Drug Screening Guidelines (Guidelines) apply retroactively, but urged that they be adopted by all law-enforcement agencies, including the State Police. *Id.* at 2.

The Guidelines evolved from the hearings, findings, and deliberations of The New Jersey Criminal Justice Advisory Council, which "is comprised of management, law enforcement personnel, union representatives and legal advisers." *Criminal Justice Advisory Council Recommendations as to Drug Testing of Law Enforcement Applicants, Police Academy Trainees and Currently Employed Law Enforcement Officers* at 1 n. 1 (1986). Thus, the Guidelines reflect the considered judgment of the State's chief law-enforcement officer and other members of the law-enforcement community concerning the appropriate balance between detecting drug use by law-enforcement officials and those officials' individual rights. Prominent among the Council's conclusions was the statement that the "Council firmly believes that illegal drug use cannot be tolerated by the law enforcement profession in this State."

In the Appellate Division, Carberry claimed for the first time that the hearing procedures resulted in a violation of his right to procedural due process. He contended that Superintendent Pagano, as "the Commander of the very Department from which the dismissal actions originate," should not have conducted the hearing. The Appellate Division agreed, stating:

> [W]e consider it plain error for the Superintendent to have heard this case. Essentially he judged the validity of drug screening protocols that had been developed and used in the Division he heads and in which, it would appear, he had previously concurred as "State Police management." Moreover, the Superintendent demonstrated at the hearing his prior confidence in the abilities and opinions of the employees who had developed and used the protocols and who appeared as witnesses to support them. In these circumstances there was at least the appearance of partiality when the Superintendent adjudicated this case by relying on those abilities in finding that the tests had been ably performed and by crediting those opinions in adopting the test protocols that had been used.

For the first time, Carberry challenged the tests as unconstitutional searches. Additionally, he asserted that the first urine test violated his due-process rights because it was arbitrary, capricious, and conducted without giving him both prior notice and the opportunity to review the results. Finally, he renewed his assertion that the second test was unreliable and inaccurate.

In remanding the case to the OAL, the Appellate Division ruled that the Administrative Law Judge (ALJ) should apply the Attorney General's Guidelines. The Appellate Division reserved judgment on Carberry's constitutional claims, but suggested that Carberry could raise at the rehearing his constitutional challenge to the urine specimen obtained through the Well–Trooper Program.

–II–

██ We begin by recognizing that Carberry possessed a protectible interest in his continued employment with the Division. After five years of continuous service, New Jersey state troopers may continue employment with the Division "during good behavior," subject to termination "for cause." *N.J.S.A.* 53:1–8.1. As a trooper with thirteen years of employment, Carberry's interest could be described as both a property interest, *see, e.g., Board of Regents v. Roth,* 408 *U.S.* 564, 577, 92 *S.Ct.* 2701, 2709, 33 *L.Ed.*2d 548, 561 (1972) (to have protected property interest in employment, employee must have a legitimate claim of entitlement to position); *Battaglia v. Union County Welfare Bd.,* 88 *N.J.* 48, 56 (1981) (only employee

entitled to position may claim right to due process prior to termination), *cert. denied,* 456 *U.S.* 965, 102 *S.Ct.* 2045, 72 *L.Ed.*2d 490 (1982), and as a liberty interest, *see, e.g., Capua v. City of Plainfield,* 643 *F.Supp.* 1507, 1520–21 (D.N.J.1986) (employment as municipal firefighter creates a protectible liberty and property interest in reputation); *cf. Greenberg v. Kimmelman,* 99 *N.J.* 552, 570–71 (1985) (the right to employment opportunity whether viewed as a liberty or property interest is protected under federal and state constitutions). Those interests require the Division to proceed with due process before terminating Carberry's employment. *Roth, supra,* 408 *U.S.* at 569–70, 92 *S.Ct.* at 2705, 33 *L.Ed.*2d at 556–57.

▮▮▮ Administrative due process requires a fair hearing before a neutral and unbiased decisionmaker. *Withrow v. Larkin,* 421 *U.S.* 35, 46–47, 95 *S.Ct.* 1456, 1464, 43 *L.Ed.*2d 712, 723–24 (1975). Because Superintendent Pagano participated in the adoption of the Division's protocols for drug testing, the Appellate Division held that the hearing procedure was flawed. We disagree.

In reaching that result, we recognize that conduct of a disciplinary hearing by the agency head might raise some doubts in the mind of the employee whether the hearing officer is impartial. Perhaps those doubts could be allayed if someone other than the Superintendent were to conduct disciplinary hearings. Although the Administrative Procedure Act reserves to an agency head the right to conduct administrative hearings in contested matters, *N.J.S.A.* 52:14F–8, the agency head may direct that a contested matter be assigned to an ALJ. Consequently, Superintendent Pagano could refer the matter to the OAL for hearing by an ALJ. Even in that context, as the head of the agency, he would retain the power to "adopt, reject or modify the recommended report and decision," *N.J.S.A.* 52:14B–10(c), or the "findings of fact and conclusions of law" of the ALJ, *N.J.S.A.* 52:14F–7. Thus the agency head has the power to make the critical decision whether to refer a matter to an ALJ, as well as the power to make the final decision on the

merits. *In re Uniform Admin. Procedural Rules*, 90 *N.J.* 85, 91–95 (1982). The point remains, however, that it is for the agency head to decide initially whether to refer the matter to the OAL.

The right to decide contested cases is an integral part of the administrative process. Administrative agencies carry out their regulatory responsibilities not only through rulemaking, *In re Uniform Admin. Procedural Rules, supra,* 90 *N.J.* at 91–93, or informal administrative action, *In re Solid Waste Customer Lists,* 106 *N.J.* 508, 518–19 (1987), but also through adjudication of contested cases. "Thus, the agency's decisional authority over contested cases is directly and integrally related to its regulatory function." *In re Uniform Admin. Procedural Rules, supra,* 90 *N.J.* at 93–94. To presume that the agency head is biased merely because he or she is applying an agency rule or regulation to a particular employee would severely undermine the function of administrative agencies.

Independent of the procedures outlined in the Administrative Procedure Act, if the agency head is tainted by actual bias, then he or she should not hear the matter. An agency head, however, does not automatically become partial or unfair merely because that person has become familiar with the facts of the case through the performance of statutory or administrative duties. *See, e.g., Hortonville J.S.D. No. 1 v. Hortonville Educ. Ass'n,* 426 *U.S.* 482, 493, 96 *S.Ct.* 2308, 2314, 49 *L.Ed.*2d 1, 9 (1976) (school board not disqualified from presiding at hearing to dismiss striking teachers although board was involved in unsuccessful pre-strike negotiations); *FTC v. Cement Inst.,* 333 *U.S.* 683, 700–03, 68 *S.Ct.* 793, 803–04, 92 *L.Ed.* 1010, 1034–35 (1948) (FTC not disqualified from hearing to determine defendant's involvement in illegal cement-pricing scheme even though FTC previously determined, after an in-depth investigation, that the pricing scheme was illegal). Nor is disqualification automatically required merely because a decisionmaker has announced an opinion on a disputed issue. *United States v. Morgan,* 313 *U.S.* 409, 420–21, 61 *S.Ct.* 999, 1003–04, 85 *L.Ed.*

1429, 1434–35 (1941) (Secretary of Agriculture not disqualified from determining rates at rehearing required by the United States Supreme Court after publicly criticizing Court's decision on issues relating to rate setting); *Kramer v. Board of Adjustment, Sea Girt,* 45 *N.J.* 268, 280–82 (1965) (statements to press by members of zoning board regarding opinion on variance for a hotel did not disqualify members as there was no showing of personal interest or malice or ill will towards party seeking relief). If an interested party has a right to cross-examine witnesses and present proof, the mere fact that an administrative agency has conducted an investigation and formulated a policy position does not necessarily mean that the mind of the agency head is closed. *FTC, supra,* 333 *U.S.* at 701, 68 *S.Ct.* at 803, 92 *L.Ed.* at 1034. Consequently, the Superintendent's acceptance of the protocols before hearing Carberry's case is "not enough to overcome the presumption of honesty and integrity in policymakers with decision making power." *Hortonville, supra,* 426 *U.S.* at 497, 96 *S.Ct.* at 2316, 49 *L.Ed.*2d at 11–12.

In this context, actual bias becomes the touchstone of disqualification. The probability of actual bias is grounds for disqualification when the decisionmaker has a pecuniary interest in the outcome of the matter or has been the target of personal criticism from one seeking relief. *Withrow, supra,* 421 *U.S.* at 47, 95 *S.Ct.* at 1464, 43 *L.Ed.*2d at 723 (citations omitted); *Kramer, supra,* 45 *N.J.* at 281–82; *Rosko v. Pagano,* 466 *F.Supp.* 1364, 1370 (D.N.J.1979) (Superintendent Pagano disqualified from disciplinary hearing where he had been target of criticism as a result of information leaked to the press by state trooper). Nothing here indicates that Superintendent Pagano had a pecuniary interest in the outcome of the proceeding or that he was engaged in a personal vendetta against Carberry because of criticism of him by Carberry or anyone else. In sum, we find no evidence of actual bias of Superintendent Pagano against Carberry.

The point remains, however, that this matter proceeded without reference to the Attorney General's Guidelines, which re-

flect the Attorney General's judgment of the appropriate balance of interests. For example, the Guidelines require testing of veteran troopers only when there is individualized reasonable suspicion, and they grant the officer under investigation the option to submit two samples, one of which should be stored and accessible to the officer and his or her attorney. The Guidelines also require that an EMIT test be confirmed through the GC–MS test before a positive result may be used against the officer.

–III–

In the present case, the test of Carberry's first urine sample was not subject to confirmation by the GC–MS test. Yet, Superintendent Pagano concluded that both tests indicated "continued use" of marijuana. Even the Division's experts recognized that an unconfirmed EMIT test is an imprecise indicator of marijuana use. Consistent with that recognition, one court has stated that "a single, unconfirmed positive EMIT test is not a rational basis for disciplining the subject of the test." See *Jones v. McKenzie*, 628 *F.Supp.* 1500, 1506 (D.D.C. 1986), *rev'd on other grounds*, 833 *F.*2d 335 (D.C.Cir.1987). Consequently, the Superintendent should not have relied on that test as the predicate to establish "continued use" of marijuana by Carberry. Under the Guidelines, however, a positive EMIT test that is confirmed through the GC-MS test is a reliable indicator of marijuana use.

Before the Division, Carberry did not challenge the constitutionality of the urine test made in the course of his medical examination, but he has raised the issue on appeal. Like the Appellate Division, we decline to decide whether it was constitutional for the Division to use the "Well–Trooper Program" as a means of obtaining urine for unannounced drug screening. Similarly, we decline to determine whether the second sample should be excluded if the first sample was obtained unconstitutionally. These constitutional challenges

are better raised initially before the agency so that it can make an adequate record. *Unemployment Compensation Comm'n v. Aragon,* 329 *U.S.* 143, 155, 67 *S.Ct.* 245, 251, 91 *L.Ed.* 136, 146 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its actions."); *cf. Bergen Pines Hosp. v. Department of Human Servs.,* 96 *N.J.* 456, 474–75 (1984) (objections to rules promulgated by agency must be raised before agency, otherwise the court undermines purpose of agency and risks making a decision on an inadequate factual record).

Since the oral argument, moreover, the United States Supreme Court has decided two cases concerning the constitutionality of urine tests. One case concerned customs officials, *National Treasury Employees Union v. Von Raab,* —— *U.S.* ——, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (1989), and the other concerned railway workers who had been involved in accidents, *Skinner v. Railway Labor Executives' Ass'n,* —— *U.S.* ——, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989). In those decisions, the Court ruled that in certain situations an employer's interest in discovering whether employees are drug-free would outweigh the privacy interests of the employees. Consequently, the Court found no fourth-amendment violation in the requirement that customs officials who carry firearms or who interdict drugs must submit to urine testing without any showing of probable cause or reasonable suspicion. Similarly, the Court sustained regulations that authorized the testing without any showing of reasonable suspicion of affected railway workers. The parties should be given the opportunity to develop an adequate record in light of those decisions.

██ Given the important interests at stake, we conclude that the appropriate result is to remand the matter to Superintendent Pagano for a rehearing, at which he should disregard the first EMIT test as indicative of marijuana use. The Super-

intendent should determine whether Carberry's consent to the second test was knowing and voluntary. He should also determine the weight to be accorded the second test in view of the Division's failure to preserve a portion of the second urine sample. In making his determination, the Superintendent may consider the Attorney General's Guidelines to the extent he deems them appropriate. Those Guidelines reflect a different policy from that reflected in the protocols that existed at the time of Carberry's offenses, and the Superintendent may weigh that policy in determining the nature and extent of any discipline to be imposed. The finding that Carberry failed to take appropriate action in the van incident is sufficiently supported by the record, and Carberry remains subject to discipline for that incident.

The judgment of the Appellate Division is modified, and the matter is remanded to the Superintendent of the State Police.

*For modification and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*For reversal*—None.