**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4614-19

ROBERT A. NOLAN, in his
official capacity as CAPE MAY
COUNTY SHERIFF, and
COUNTY OF CAPE MAY,

     Plaintiffs-Appellants,

v.

GURBIR S. GREWAL, in his
official capacity as ATTORNEY
GENERAL OF THE STATE OF
NEW JERSEY, and OFFICE
OF THE ATTORNEY GENERAL,
DEPARTMENT OF LAW AND
PUBLIC SAFETY, DIVISION OF
CRIMINAL JUSTICE,[1]

     Defendants-Respondents.

_____

Submitted November 4, 2021 – Decided January 26, 2022

Before Judges Hoffman, Whipple, and Susswein.

---

[1]   The caption in the parties' briefs incorrectly designates the Office of the Attorney General as the "Office of the State of New Jersey."

On appeal from the Office of the Attorney General, Department of Law and Public Safety, Division of Criminal Justice.

Jeffrey R. Lindsay, Cape May County Counsel, attorney for appellants (Jeffrey R. Lindsay, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondents (Jeremy Feigenbaum, State Solicitor, and Jane C. Schuster, Assistant Attorney General, of counsel and on the brief; Emily Marie Bisnauth, Marie Soueid, Emily Wanger, and Sean P. Havern, Deputy Attorneys General, on the brief).

PER CURIAM

Robert Nolan, in his official capacity as Cape May County Sheriff, and the County of Cape May (appellants) filed this action with this court on August 28, 2020, seeking a judgment declaring invalid and unenforceable Attorney General Law Enforcement Directive No. 2018-6 v2.0, also known as the Immigrant Trust Directive (Directive 2018-6 v2.0 or the Directive). The Attorney General issued the Directive, which places strict limitations on state, local, and county law enforcement agencies regarding their participation in the enforcement of federal immigration law, with the goal of improving public trust and clarifying the distinct roles of federal and state actors.

Appellants contend the Attorney General's issuance of the Directive, without complying with the New Jersey Administrative Procedure Act (APA),

A-4614-19

N.J.S.A. 52:14B-1 to -31, renders it invalid and unenforceable.  We disagree, concluding that the Directive falls under the statutory exemptions for inter-agency and intra-agency communications, as well as the statutory exemption for statements concerning the internal management of an agency.  N.J.S.A. 52:14B–2.  We therefore affirm the action of the Attorney General's issuance of Directive 2018-6 v2.0.

## I.

We begin with a review of immigration law and prior Directives issued by the Attorney General regarding the participation of state, local, and county law enforcement agencies in the enforcement of federal immigration law.

### A. Background on Immigration Law

Under our federal system, the federal government "has broad, undoubted power over the subject of immigration and the status of aliens," Arizona v. United States, 567 U.S. 387, 394 (2012), while the "States possess primary authority for defining and enforcing the criminal law." United States v. Lopez, 514 U.S. 549, 561 n.3 (1995).  Pursuant to the federal government's authority in this area, the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 to 1537, "establishe[s] a 'comprehensive federal statutory scheme for regulation of immigration and naturalization.'"  Chamber of Com. of U.S. v. Whiting, 563

3

U.S. 582, 587 (2011) (quoting De Canas v. Bica, 424 U.S. 351, 353 (1976)). This includes regulation of "which aliens may be removed from the United States and the procedures for doing so." Arizona, 567 U.S. at 396. "Agencies in the Department of Homeland Security[,]" including Immigration and Customs Enforcement (ICE), "play a major role in enforcing" the INA. Id. at 397. ICE is responsible both for "conduct[ing] criminal investigations involving the enforcement of immigration-related statutes" and "for the identification, apprehension, and removal of illegal aliens from the United States." Ibid. "Removal is a civil, not criminal, matter[,]" over which federal immigration officials exercise "broad discretion." Id. at 396.

However, "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States[,]" which "bear[] many of the consequences of unlawful immigration." Id. at 397. The powers of the federal government to regulate immigration, and the State, to regulate criminal conduct, "intersect when a state or city arrests an individual whom ICE would also like to apprehend for removal proceedings." City of Phila. v. Att'y Gen. of the U.S., 916 F.3d 276, 281 (3d Cir. 2019). "Consultation between federal and state officials is an important feature of the immigration system." Arizona, 567 U.S. at 411. Various provisions of the INA "specif[y] limited circumstances in which

A-4614-19

state officers may perform the functions of an immigration officer. A principal example is when the [United States] Attorney General has [pursuant to Section 287(g) of the INA] granted that authority to specific officers in a formal agreement with a state or local government." Id. at 408 (citing 8 U.S.C. § 1357(g)(1)). These agreements allow state, county, or local law enforcement officers to perform the "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens . . . at the expense of the State or political subdivision[,]" but under the direction and supervision of the United States Attorney General. 8 U.S.C. § 1357(g)(1) to (3).

Section 287(g) makes clear that it does not require states and localities to enter into these agreements. 8 U.S.C. § 1357(g)(9). Where such agreements exist, state law enforcement officers may operate under them only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). Other forms of cooperation contemplated by the INA are also generally voluntary on the part of states and localities. For example, the INA refers to detainer requests, 8 U.S.C. § 1357(d), but "does not authorize federal officials to command state or local officials to detain suspected aliens subject to removal" nor to command "notice of a prisoner's release." Galarza v. Szalczyk, 745 F.3d 634, 641 (3d Cir. 2014).

5

In short, while state and federal cooperation is important to the immigration system that Congress has put in place, that system ultimately entrusts the enforcement of federal immigration laws to federal authorities. State law enforcement officers are not required to enforce federal immigration laws, Galarza, 745 F.3d at 644, nor are they permitted to do so except in "limited circumstances" specified by federal law. Arizona, 567 U.S. at 408.

B. The New Jersey Attorney General's Authority

"As head of the Department of Law and Public Safety, the Attorney General is the chief law-enforcement officer in the State." In re Carberry, 114 N.J. 574, 577-78 (1989) (citing N.J.S.A. 52:17B-2). "In that capacity, the Attorney General is required 'to formulate and adopt rules and regulations for the efficient conduct of the work and general administration of the department, its officers and employees.'" Id. at 578 (quoting N.J.S.A. 52:17B-4(d)). In addition, the Criminal Justice Act of 1970, N.J.S.A. 52:17B-97 to -117, provides that the Attorney General is also responsible "for the general supervision of criminal justice . . . in order to secure the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the State." N.J.S.A. 52:17B-98. Accordingly, our Supreme Court has "[r]ecogniz[ed] the Attorney General's role as New Jersey's chief law

A-4614-19

enforcement officer, with the authority to adopt guidelines, directives, and policies that bind police departments statewide." Paff v. Ocean Cnty. Prosecutor's Off., 235 N.J. 1, 19 (2018).

C. APA Rulemaking

"Agencies may 'act informally, or formally through rulemaking or adjudication in administrative hearings.'" Grimes v. N.J. Dep't of Corr., 452 N.J. Super. 396, 404 (App. Div. 2017). Although an agency has discretion to choose between rulemaking, adjudication, or informal action in discharging its duties, courts defer to that choice only if "it complies with due process requirements and the" APA. Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 137 (2001). Thus, while courts ordinarily defer to an agency's interpretation "of statutes and regulations within its implementing and enforcing responsibility[,]" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)), courts will not defer to an agency when interpreting the APA or determining whether an agency violated the APA.

"An 'administrative rule' can be promulgated only on notice and in compliance with N.J.S.A. 52:14B-4" of the APA. Woodland Priv. Study Grp. v. State, 109 N.J. 62, 65 (1987). Specifically, "an agency must provide thirty

days' notice of its intent to issue the rule, publish a summary and explanation of the rule, and afford 'all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing.'" Doe v. Poritz, 142 N.J. 1, 95 (1995) (quoting N.J.S.A. 52:14B-4). "No rule . . . is valid unless adopted in substantial compliance with" these procedures. N.J.S.A. 52:14B-4(d). "The 'essential purpose of notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies.'" Id. at 73 (quoting Batterton v. Marshall, 648 F.2d 694, 703 (D.C. Cir. 1980)). Thus, "compliance with the APA procedures serves the interests of 'fairness and due process.'" Grimes, 452 N.J. Super. at 407 (quoting Holmdel Builders Ass'n v. Holmdel, 121 N.J. 550, 578 (1990)).

N.J.S.A. 52:14B-2 defines "administrative rule" or "rule" as an

> agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intra-agency and inter-agency statements; and (3) agency decisions and findings in contested cases.

A-4614-19

There are three distinct reasons why formal rulemaking procedures would not be required before an agency can act: the action may require adjudication rather than rulemaking; the action may be an "informal action[,]" meaning one "that is neither adjudication nor rulemaking"; or the action may be exempt from rulemaking procedures as an internal management, intra-agency, or inter-agency statement. Woodland Priv. Study Grp., 109 N.J. at 66-68 (citing In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 519 (1987)). Rulemaking procedures are only required where an agency's action both (1) has the characteristics of an administrative rule, rather than of informal action or adjudication, and (2) falls outside of the statutory exceptions for inter- and intra-agency statements and statements concerning internal management. Grimes, 452 N.J. Super. at 406.

D.     2007 Directive

On August 22, 2007, then New Jersey Attorney General Anne Milgram issued Law Enforcement Directive No. 2007-3 (the 2007 Directive) to "establish the manner in which local, county, and State law enforcement agencies and officers shall interact with federal immigration authorities."

The 2007 Directive required state, county, or local law enforcement officers to "inquire about [an] arrestee's citizenship, nationality and immigration

status" during the booking process if the individual was arrested for "any indictable crime, or for driving while intoxicated." It provided, further, that an arresting officer "shall notify" ICE if the officer had "reason to believe that the [arrestee] may not be lawfully present in the United States," unless the County Prosecutor or Director of the Division of Criminal Justice determined, in writing, that "good cause exist[ed] to refrain from notifying ICE." The same notice was required to be given to "the prosecuting authority that will handle the matter . . . , and to any court officer setting bail or conditions of pretrial release."

While the 2007 Directive acknowledged that "enforcement of immigration laws is primarily a federal responsibility," and that "[t]he overriding mission of law enforcement officers in this State is to enforce the state's criminal laws and to protect the community that they serve[,]" Attorney General Milgram concluded that the inquiry and notice requirements were warranted, explaining:

> [A]fter an individual has been arrested for a serious violation of State criminal law, the individual's immigration status is relevant to his or her ties to the community, the likelihood that he or she will appear at future court proceedings to answer State law charges, and the interest of the federal government in considering immigration enforcement proceedings against [the] individual whom the State has arrested for commission of a serious criminal offense. When there is reason to believe that the arrestee may be an undocumented immigrant, the arresting agency is

10

responsible for alerting federal immigration officials, the prosecuting agency, and the judiciary.

The 2007 Directive also established standards for state, county, and local law enforcement agencies and officers regarding their agreements with ICE to exercise federal immigration authority and "perform[] functions of a federal immigration officer," pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g). While the 2007 Directive did not prohibit such agreements, it cautioned that "[t]he exercise of federal immigration enforcement authority by State, county or local law enforcement officers must . . . be consistent with, and in support of, their State law enforcement mission."

Moreover, the 2007 Directive placed specific limitations on officers and agencies operating under Section 287(g) agreements. The 2007 Directive: 1) prohibited State, county, or local law enforcement officers from exercising federal immigration "authority under Section 287(g) unless and until the officer has arrested an individual(s) for violation of an indictable offense, or for driving while intoxicated, under State law"; 2) required officers to report any inquiry into an arrestee's immigration status to their supervisors, and provide documentation of the arrest leading to the inquiry; 3) required monthly submission of all such reports to the Division of Criminal Justice "to ensure that immigration enforcement efforts [were] being performed in compliance with all

11

applicable State laws, directives, and guidelines[,]" and so that aggregate data on those efforts could be made "public on an annual basis"; and 4) required that all Section 287(g) agencies "enter into a written agreement with an appropriate ICE-approved detention facility or facilities to ensure that there is adequate space to hold potential federal detainees" before exercising any authority under a Section 287(g) agreement.

E. The Immigrant Trust Directive

The 2007 Directive remained in effect until November 29, 2018, when Attorney General Gurbir S. Grewal issued Directive No. 2018-6, which "repeal[ed] and supersede[d] the provisions of [the 2007 Directive]." Among other policy changes, Directive No. 2018-6 "required law enforcement agencies to seek approval from the Attorney General before renewing existing 287(g) agreements or entering into new ones."

When the Attorney General issued Directive No. 2018-16, "only three law enforcement agencies in New Jersey – all County Sheriff's Offices – continued to rely on such agreements." One of them, the Cape May County Sheriff's Office, entered into a Section 287(g) agreement with ICE on April 10, 2017. Appellants did not include the agreement in the record, but state in their brief that "[t]he agreement permitted designated corrections officers to identify

12

and process for removal any undocumented immigrant who was confined to the Cape May County Correctional Facility and fell within ICE's civil immigration enforcement priorities."

On September 27, 2019, the Attorney General issued Directive No. 2018-6 v2.0, prohibiting State, county, and local law enforcement agencies from entering into, modifying, renewing, or extending any Section 287(g) agreement, and further prohibits the "exercise [of] any law enforcement authority pursuant to a preexisting Section 287(g) agreement."  Directive 2018-6 v2.0 establishes numerous other restrictions and guidelines for State, county, and local law enforcement operations in relation to federal immigration enforcement.  Indeed, the guidelines are extensive and comprehensive compared to those of the 2007 Directive.

Section II.A of the Directive prohibits New Jersey law enforcement from stopping, arresting, searching, or detaining any individual based solely on the individual's "actual or suspected citizenship or immigration status[,] or [any] actual or suspected violations of federal civil immigration law."  This provision is consistent with the 2007 Directive's prohibition on State, county, or local law enforcement exercising federal immigration "authority under Section 287(g) unless and until the officer has arrested an individual(s) for violation of an

13                                                                              A-4614-19

indictable offense, or for driving while intoxicated, under State law." Further,

Section II.A prohibits New Jersey law enforcement from "[i]nquir[ing] about

the immigration status of any individual, unless doing so is: a) necessary to the

ongoing investigation of an indictable offense by that individual; and b) relevant

to the offense under investigation." (emphasis added). This provision, by

contrast to the first, not only repeals the 2007 Directive's inquiry requirement,

but generally prohibits such inquiries.

Subject to certain enumerated exceptions, Section II.B provides:

> [N]o state, county, or local law enforcement agency or official shall provide the following types of assistance to federal immigration authorities when the sole purpose of that assistance is to enforce federal civil immigration law:
>
> 1. Participating in civil immigration enforcement operations.
>
> 2. Providing any non-public personally identifying information regarding any individual.
>
> 3. Providing access to any state, county, or local law enforcement equipment, office space, database, or property not available to the general public.
>
> 4. Providing access to a detained individual for an interview, unless the detainee signs a written consent form . . . .
>
> 5. Providing notice of a detained individual's upcoming release from custody, unless the detainee:

14

a. Is currently charged with, has ever been convicted of, has ever been adjudicated delinquent for, or has ever been found guilty by reason of insanity of, a violent or serious offense as that term is defined in Appendix A;

b. In the past five years, has been convicted of an indictable crime other than a violent or serious offense, or

c. Is subject to a Final Order of Removal that has been signed by a federal judge and lodged with the county jail or state prison where the detainee is being held.

6. Continuing the detention of an individual past the time he or she would otherwise be eligible for release from custody based solely on a civil immigration detainer request . . . .

Section II.B.6 is subject to the same exceptions as II.B.5, meaning, for example, that New Jersey law enforcement could continue the detention of an individual who had previously been convicted of a "violent or serious offense."

In addition to the "violent and serious offense" exception and Section II.B's general qualifier that the prohibited activities are only prohibited "when the sole purpose of that assistance is to enforce federal civil immigration law[,]" the provisions of both Section II.A and II.B are subject to enumerated limitations:

15

Nothing in Sections II.A and II.B shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from:

1. Enforcing the criminal laws of this state.

2. Complying with all applicable federal, state, and local laws.

3. Complying with a valid judicial warrant or other court order, or responding to any request authorized by a valid judicial warrant or other court order.

4. Participating with federal authorities in a joint law enforcement taskforce the primary purpose of which is unrelated to federal civil immigration.

5. Requesting proof of identity from an individual during the course of any arrest or when legally justified during an investigative stop or detention.

6. Asking an arrested individual for information necessary to complete the required fields of the LIVESCAN database (or other law enforcement fingerprinting database), including information about the arrestee's place of birth and country of citizenship.

7. Inquiring about a person's place of birth on a correctional facility intake form and making risk-based classification assignments in such facilities.

8. Providing federal immigration authorities with information that is publicly available or readily available to the public in the method the public can obtain it.

9. When required by exigent circumstances, providing

A-4614-19

federal immigration authorities with aid or assistance . . . .

10. Sending to, maintaining or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful, of any individual. See 8 U.S.C. §§ 1373, 1644.

Additionally, "[n]othing in Section II of this Directive shall apply to law enforcement agencies that are currently party to an Intergovernmental Service Agreement (IGSA) to detain individuals for civil immigration enforcement purposes when they are acting pursuant to such an agreement." IGSAs, unlike Section 287(g) agreements, are not prohibited under the Directive.

Section V of the Directive sets forth "[c]onsiderations for [p]rosecutors." For example, Section V.B provides that "[i]n assessing whether to seek pretrial detention of an arrestee . . . , the prosecutor shall make an individualized assessment based on the specific facts presented in each case, and shall not simply assume that a non-citizen presents a risk of flight." Similarly, Section V.D states that when deciding how to charge a defendant or what sentence to seek, "[a]s in all cases, . . . prosecutor[s] should be mindful of potential collateral consequences and consider such consequences in attempting to reach a just resolution of the case." This is only a broad guideline; "[n]othing in [the]

17

Directive shall be construed . . . to limit prosecutorial discretion in reaching a just resolution of [a] case . . . ."

Section VI.A of the Directive requires New Jersey law enforcement agencies and officials to "promptly notify a detained individual, in writing and in a language the individual can understand, when federal civil immigration authorities request . . . [t]o interview the detainee[,] . . . [t]o be notified of the detainee's upcoming release from custody[,]" or the "continue[d] det[ention of] the detainee past the time he or she would otherwise be eligible for release." "When providing such notification, law enforcement officials shall provide the detainee a copy of any documents provided by immigration authorities in connection with the request"; however, the Directive provides that nothing in it "shall be construed in any way to create any substantive right that may be enforced by any third party." The Directive further states that its provisions are severable.

F. Objectives of Directive 2018-6 v2.0

The Attorney General explained the rationale for the Directive as follows:

> In recent years, the federal government has increasingly relied on state and local law enforcement agencies to enforce federal civil immigration law. This trend presents significant challenges to New Jersey's law enforcement officers, who have worked hard to

build trust with our state's large and diverse immigrant communities.

It is well-established, for example, that individuals are less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities. This fear makes it more difficult for officers to solve crimes and bring suspects to justice, putting all New Jerseyans at risk.

It is therefore crucial that the State of New Jersey makes very clear to our immigrant communities something that may seem obvious to those of us in law enforcement: there is a difference between state, county, and local law enforcement officers, who are responsible for enforcing state criminal law, and federal immigration authorities, who enforce federal civil immigration law.

Put simply, New Jersey's law enforcement officers protect the public by investigating state criminal offenses and enforcing state criminal laws. They are not responsible for enforcing civil immigration violations except in narrowly defined circumstances. Such responsibilities instead fall to the federal government and those operating under its authority.

Although state, county, and local law enforcement officers should assist federal immigration authorities when required to do so by law, they should also be mindful that providing assistance above and beyond those requirements threatens to blur the distinction between state and federal actors and between federal immigration law and state criminal law. It also risks undermining the trust we have built with the public.

19

The Attorney General added that "technological advances and changes in federal immigration enforcement priorities . . . rendered [the 2007 Directive] less effective" and that the new Directive sought to "ensure that limited state, county, and local law enforcement's resources are directed towards enforcing the criminal laws of this state."

On the same day Directive 2018-6 v2.0 was issued, the Attorney General sent a letter to "All Law Enforcement Chief Executives" explaining the revisions. The Attorney General stressed that "the revised Directive updates the list of violent and serious offenses where notice to ICE is permitted," and provides "that New Jersey's state, county, and local law enforcement agencies may no longer enter into or operate under 287(g) agreements." The Attorney General explained further that "claim[s] that . . . 287(g) agreement[s] [are] necessary to ensure that dangerous individuals are not released 'back on the streets'" are "simply incorrect" because the Directive "explicitly allows any state, county, or local law enforcement agency to refer any individual to ICE who has been charged with a 'violent or serious offense,' a term that includes murder, rape, arson, and domestic violence crimes."

20

II.

Appellants filed this proceeding after first filing a complaint in the United States District Court for the District of New Jersey, seeking declaratory and injunctive relief prohibiting defendants from enforcing the Directive. Cty. of Ocean v. Grewal, 475 F. Supp. 3d 355 (D.N.J. 2020) aff'd 8 F. 4th 176 (3rd Cir. 2021).[2] Defendants filed a motion to dismiss, which the District Court granted on July 29, 2020. 475 F. Supp. 3d at 361. The court rejected appellants' claims that elements of the Directive were preempted by federal immigration statutes, finding "no indication that Congress, in enacting the [INA], sought to usurp" New Jersey's "police power to regulate the conduct of its own law enforcement agencies . . . . As such, the federal government cannot strong arm the State into doing its own bidding." Id. at 376. The court declined to exercise supplemental jurisdiction over appellants' state-law claims, noting that those claims could be brought in state court. Id. at 386.

Before this court, plaintiffs argue the Directive constitutes an administrative rule that was required to be promulgated in accordance with APA rulemaking procedures pursuant to Metromedia, Inc. v. Dir., Div. of Taxation,

---

[2] The court consolidated appellants' action with a similar action filed by the County of Ocean. 475 F. Supp. 3d at 361.

97 N.J. 313, 331-32 (1984).[3] Plaintiffs further contend that that the Directive does not fall within any of the statutory exceptions to the required rulemaking procedures, asserting that it has "a substantial impact on the rights or interests of the regulated public." Woodland, 109 N.J. at 75.

In Woodland, our Supreme Court defined an "intra-agency statement as (1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public." Id. at 75. The Court explained that while rulemaking procedures are required "[w]here a legally countenanced right of a party is threatened by an internal communication of an agency, . . . an interest that cannot be abridged without rulemaking procedure . . . must ultimately be legitimate, of justifiable concern." Id. at 74.

---

[3] Pursuant to this argument, appellants contend we must apply the factors set forth by the Court in Metromedia, 97 N.J. 313, 331–32 (1984), to determine whether the Directive qualifies as an "administrative rule," as defined by N.J.S.A. 52:14B–2. However, we conclude that a Metromedia analysis is not required here, as this case turns on the applicability of the statute's definitional exclusions from the term "administrative rule." See Poritz (explaining that the Metromedia factors do not control when the issue concerns the applicability of the statutory exclusions); N.J. Builders, 306 N.J. Super. at 100 (declining to apply the Metromedia factors, pursuant to the Court's holding in Woodland, because the analysis focused on application of the statutory exclusions).

The Directive satisfies the first requirement of an inter-agency and intra-agency communication because it was issued to "All Law Enforcement Chief Executives," and therefore, it qualifies as "a communication between agency members" or agencies. Id. at 75. Furthermore, the Directive is "intended to govern the conduct of agency employees, as opposed to members of the regulated public." N.J. Builders Ass'n v. N.J. Dep't of Env't Prot., 306 N.J. Super. 93, 102 (App. Div. 1992).

The Directive also satisfies the intertwined second and third requirements of an inter-agency and intra-agency communication. In dicta, our Supreme Court stated that internal memorandum regarding prosecutorial discretion is not an administrative rule, despite its substantial impact. Woodland, 109 N.J. at 74-75. Further, the Attorney General "must make important choices" on how best to allocate "limited resources[.]" Id. at 74. By issuing the Directive, the Attorney General has chosen to ensure that limited state, county, and local law enforcement resources are directed towards enforcing the criminal laws of this state rather than federal immigration laws, "except in narrowly defined circumstances" or where "required to do so by law." In this context, the public's generalized "interest in the broad policy issues associated with immigration," is less a legitimate interest in protecting it from any harms illegal immigrants may

A-4614-19

cause, and more an "interest in frustrating the agency's enforcement mechanism[,]" which "cannot be said to [be] . . . legitimate." Woodland, 109 N.J. at 74.

III.

The dispositive issue presented by this appeal is whether the Directive establishes rules that were required to have been promulgated through APA rulemaking procedures. Appellants do not challenge the substance of the Directive or the Attorney General's factual findings, or argue that the Directive is arbitrary, capricious, or unreasonable. Thus, we do not need to examine the decision-making process that led to the issuance of the Directive.

Appellants argue that the Directive constitutes an administrative rule that was required to be promulgated in accordance with the APA's rulemaking procedures, pursuant to Metromedia, 97 N.J. at 331-32. In their reply brief, appellants assert the Directive does not fall within the statutory exceptions to the required rulemaking procedures because of its "substantial impact on the rights or interests of the regulated public." These arguments lack merit.

Statutory Exceptions to APA Rulemaking Procedures

As noted, N.J.S.A. 52:14B-2 provides that the term "'administrative rule' or 'rule'" as used in the APA "does not include: (1) statements concerning the

24

internal management or discipline of any agency; [and] (2) intra-agency and inter-agency statements." As a result, intra-agency and inter-agency statements, and statements concerning internal management, are not subject to the APA's requirement that agencies comply with notice and comment procedures "[p]rior to the adoption, amendment, or repeal of any rule." N.J.S.A. 52:14B-4(a). These exceptions allow the executive branch to avoid the administrative burdens of the notice and comment process and act through more streamlined procedures where "the underlying purposes of the rulemaking procedural requirements" are not implicated. Woodland, 109 N.J. at 73.

In Woodland, our Supreme Court defined an "intra-agency statement as (1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public." Id. at 75. The Court explained that while rulemaking procedures are required "[w]here a legally countenanced right of a party is threatened by an internal communication of an agency, . . . an interest that cannot be abridged without rulemaking procedure . . . must ultimately be legitimate, of justifiable concern." Id. at 74. "The inquiry is whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected." Id. at 75. Stated differently:

> [A]n agency order will be deemed an exempt intra-agency statement to the extent (1) it is intended to govern the conduct of agency employees, as opposed to members of the regulated public; (2) any impact on the regulated public is incidental or unsubstantial; and (3) that impact is on interests or rights that do not rise to a level needing the protection afforded by the APA rule-making procedures.
>
> [N.J. Builders, 306 N.J. Super. at 102.]

Although New Jersey courts have not yet defined an "inter-agency statement," we conclude that only the first element of the "intra-agency statement" definition, as set forth in Woodland, would require alteration. Therefore, we now define the term "inter-agency statement" as set forth in N.J.S.A. 52:14B-2 as (1) a communication between or among members of different agencies that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public. Because the definition is otherwise identical to that of an "intra-agency statement," we need not determine whether a directive of the Attorney General that applies to local law enforcement agencies is an inter-agency or intra-agency communication.

To illustrate the difference between "legitimate" and illegitimate interests, the Court in Woodland considered the example of "internal agency memoranda . . . relating to prosecutorial discretion[,]" and concluded that notice and

26

comment procedures were not required for such communications. 109 N.J. at 74. The Court reasoned:

> Given limited resources, an agency must make important choices regarding which actions of the regulated public it should monitor or prosecute. In a real sense these communications can have a substantial impact on the regulated public: the memorandum may ultimately determine who is prosecuted, and knowledge of the communication might facilitate illegal conduct. The regulated public cannot be said to have a legitimate interest in frustrating the agency's enforcement mechanism, and thus public hearing and notice need not precede issuance of the internal memorandum.
>
> [Id. at 74-75.]

This distinction, between legitimate and illegitimate interests, is important because "[t]he 'substantial impact' test alone" sets a low bar and "may not be sufficient to isolate those internal agency statements that remain immune from the notice and hearing requirements." Id. at 74. For example, "an internal agency directive prohibiting agency members from accepting free lunches will have a 'substantial impact' on those members of the public with an interest in buying lunch for a regulator[,]" but that interest is "not sufficiently important or worthy of recognition." Ibid.

Recently, we considered challenges to two Attorney General directives that amended the Internal Affairs Policy and Procedures (IAPP) to require law

enforcement to publish reports on officer discipline and make public disciplined officers' names. In re Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6, 465 N.J. Super. 111, 124 (App. Div. 2020), aff'd, 246 N.J. 462 (2021). Noting a "long-standing view that the Attorney General's law enforcement directives and guidelines 'are not administrative rules[,]'" we held that the directives fell within the "statements concerning . . . internal management or discipline" exception to APA rulemaking. Id. at 159-60 (quoting O'Shea v. Twp. of W. Milford, 410 N.J. Super. 371, 383 (App. Div. 2009)). We did not apply a "substantial impact" test or the Metromedia test. Ibid. Our Supreme Court affirmed. In re Att'y Gen. Law Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. 462, 506 (2021). Regarding the claim that the directives "r[a]n afoul of the APA[,]" the Court "affirm[ed] the judgment of the Appellate Division largely for the reasons stated in Judge Accurso's thoughtful opinion." Ibid.

We acknowledge that it is not an absolute rule that directives and guidelines issued by the Attorney General are exempt from APA rulemaking requirements. In Poritz, 142 N.J at 96, the Court concluded that guidelines issued by the Attorney General pursuant to a sex offender "Community Notification Law" could not "be considered internal department communications." The law required "local chief[s] of police to give [members

28                                                                  A-4614-19

of the public] notification of" a registered sex offender's "presence in the community," and "provide[d] for three levels of notification . . . depending on the risk of reoffense." Id. at 22 (citing N.J.S.A. 2C:7-7 and N.J.S.A. 2C:7-8(c)).

We agree with the Attorney General that Metromedia does not apply to the Directive because "an APA exception applies." The Directive is intended to have wide coverage and concerns a "large segment of the regulated or general public, rather than an individual or a narrow select group." Metromedia, 97 N.J. at 331. Section II, for example, establishes standards for law enforcement interactions with "any individual." Even narrower provisions, such as those which allow law enforcement to notify ICE of a detainee's release, concern a broad class of persons, including detainees who "ha[ve] been convicted of [any] indictable crime" in the past five years, detainees who have at any time been convicted of a violent or serious offense, and detainees who are subject to a final order of removal. The Directive applies "generally and uniformly to all similarly situated persons" and "to operate only in future cases." Ibid. That is, the Directive does not constitute a determination in a "particular case[,]" but instead, it provides a set of prospective "general standard[s]" that law enforcement must follow in all circumstances described by the Directive. Id. at 329.

We agree with the Attorney General that the Directive is exempt from rulemaking requirements as an inter- or intra-agency statement, or as a statement concerning internal management.

The Directive satisfies the first requirement of an inter- or intra-agency communication because it was issued to "All Law Enforcement Chief Executives," and therefore, it qualifies as "a communication between agency members" or agencies. Woodland, 109 N.J. at 75. Furthermore, the Directive is "intended to govern the conduct of agency employees, as opposed to members of the regulated public." N.J. Builders Ass'n, 306 N.J. Super. at 102. It is concerned primarily with the permissible extent of cooperation between New Jersey and federal immigration authorities, and establishes guidelines for law enforcement interactions with members of the public, but the Directive in no way governs the public itself.

Appellants argue, however, that the Directive "more directly" affects the state's immigrant communities than it does law enforcement agencies. They contend that the Directive falls outside of the statutory exceptions to rulemaking, because it "has a substantial impact on the rights and interests of illegal immigrants[,] . . . as well as the public's interest in the broad policy issues

associated with immigration, . . . which [is] . . . . sufficiently important and worthy of recognition." This argument lack merit.

The liberty interests of illegal immigrants, and the public's interest in seeing immigration laws enforced, could be analogized to the interests recognized in Poritz, 142 N.J. at 96, as legitimate: "the offender's liberty interest [and] the public's interest in the protection of children." This argument is complicated, however, by the Court's guidance in Woodland, 109 N.J. at 74-75, that an internal memorandum relating to prosecutorial discretion – that is, one that makes "choices regarding which actions of the regulated public it should monitor or prosecute" – is not an administrative rule, despite its substantial impact. Because such a policy "may ultimately determine who is prosecuted," and because knowledge of the policy may "facilitate illegal conduct[,]" id. at 74, one could describe it as impacting the interests later recognized in Poritz, 142 N.J. at 96: "the offender's liberty interest" or the "the public's interest in" its protection from crime. Nevertheless, the Woodland Court emphasized that "[t]he regulated public cannot be said to have a legitimate interest in frustrating the agency's enforcement mechanism . . . ." Woodland, 109 N.J. at 74.

The Directive here is more analogous to an internal memorandum relating to prosecutorial discretion than it is to the implementation of the specific

31

program at issue in <u>Poritz</u>. The Attorney General "must make important choices" on how best to allocate "limited resources[,]" <u>ibid.</u>, and in this case, has chosen to "ensure that limited state, county, and local law enforcement resources are directed towards enforcing the criminal laws of this state" rather than federal immigration laws, "except in narrowly defined circumstances" or where "required to do so by law." In this context, the public's generalized "interest in the broad policy issues associated with immigration," is less a legitimate interest in protecting it from any harms illegal immigrants may cause, and more an "interest in frustrating the agency's enforcement mechanism[,]" which "cannot be said to [be] . . . legitimate." <u>Ibid.</u>

That characterization of the public's interest applies to the Directive, considering that state law enforcement's participation in enforcing immigration laws is, unlike its enforcement of state criminal laws, limited and entirely optional by design. If an agency's choice to deprioritize the prosecution of certain offenses – offenses that state law tasks it with prosecuting – is not a matter of justifiable concern to the public of this state, <u>id.</u> at 74-75, the public's interest is even slighter where, as here, an agency opts to prioritize enforcement of laws it is directed to enforce, over those it has not been directed to enforce.

<span>A-4614-19</span>

While the guidance in <u>Woodland</u> regarding prosecutorial discretion is dicta,[4] it illustrates that the ultimate "inquiry is whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected." <u>Id.</u> at 75. This means asking not simply whether a legitimate interest is implicated, but whether the agency action burdens, abridges, or "jeopardize[s]" those interests, <u>id.</u> at 71 (quoting <u>Batterton</u>, 648 F.2d at 708), such that "the protection afforded by the APA rule-making procedures" applies. <u>N.J. Builders Ass'n</u>, 306 N.J. Super. at 102.

Here, the liberty interests of illegal immigrants do not outweigh the Attorney General's interest in using a streamlined procedure to adopt a policy that furthers, rather than jeopardizes, those interests. This is particularly relevant to Section VI.A of the Directive, which appellants charge "is intended solely to assist" illegal immigrants in evading federal authorities. Section VI.A, requiring law enforcement officers to notify detained individuals when federal immigration authorities request to interview them, to be notified of their

---

[4] We note that, in this State, Supreme Court dicta is binding. As the Court explained in <u>State v. Dabas</u>, 215 N.J. 114, 136-37 (2013), "[T]he prosecutor's office is not at liberty to disregard a pronouncement of this Court, even if that pronouncement is properly characterized as dictum. (citations omitted). Appellate and trial courts consider themselves bound by this Court's pronouncements, whether classified as dicta or not."

upcoming release, or to continue their detainment, is unique among the Directive's provisions.  Whereas the Directive's other key provisions concern prosecutorial discretion and enforcement priorities (Section II, limiting New Jersey law enforcement agencies' participation in immigration enforcement; Section III, prohibiting section 287(g) agreements; and Section V providing guidance to prosecutors), Section VI.A creates an entirely new procedural protection for detainees.  The notification requirement still only "govern[s] the conduct of agency employees," N.J. Builders Ass'n, 306 N.J. Super. at 102, and cannot be said to substantially impact or expand detainees' rights, as it is not enforceable by them.

Furthermore, while Section VI.A may have the effect of "protect[ing] illegal immigrants from federal immigration authorities[,]" appellants' contention that this was the Attorney General's purpose lacks support in the record.  Rather, the Attorney General determined that it is "crucial" to "make[] very clear to our immigrant communities" that "there is a difference between state, county, and local law enforcement officers, who are responsible for enforcing state criminal law, and federal immigration authorities, who enforce federal civil immigration law."  Section VI.A furthers that objective. By notifying detainees that "federal civil immigration authorities request" to

interview them, be notified of their upcoming release, or continue their detainment, New Jersey law enforcement officers communicate that there is a "distinction[] between state and federal actors."

In this way, Section VI.A is akin to the Attorney General's adoption of policies making police discipline more transparent. Both go beyond internal agency workings or communications to require information be given to the public, or in this case, specific members of the public. Both do so with the aim of enhancing public trust. Both impact weighty interests of significant social concern. But neither jeopardizes the rights or interests of affected members of the public. For this reason, the Directive can be characterized as an inter-agency or intra-agency communication and is therefore exempt from APA rulemaking.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

35